# ZADVYDAS *v.* DAVIS ET AL.

No. 99–7791.   Argued February 21, 2001—Decided June 28, 2001*

---

*Together with No. 00–38, *Ashcroft, Attorney General, et al.* v. *Kim Ho Ma,* on certiorari to the United States Court of Appeals for the Ninth Circuit.

680

BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 702. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, and in which SCALIA and THOMAS, JJ., joined as to Part I, *post*, p. 705.

*Jay W. Stansell* argued the cause for respondent in No. 00–38. With him on the brief were *Thomas W. Hillier II* and *Jennifer E. Wellman.*

*Robert F. Barnard* argued the cause for petitioner in No. 99–7791. With him on the briefs was *Virginia Laughlin Schlueter.*

*Deputy Solicitor General Kneedler* argued the cause for respondents in No. 99–7791 and petitioners in No. 00–38. With him on the briefs were *Acting Solicitor General Underwood,* former *Solicitor General Waxman, Assistant Attorney General Ogden, Beth S. Brinkmann, Donald Keener,* and *Quynh Vu.**

---

*Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging affirmance in No. 99–7791.

Briefs of *amici curiae* urging affirmance in No. 00–38 were filed for the Catholic Legal Immigration Network, Inc., et al. by *Laurie Joyce* and *Josh Dratel;* for the American Association of Jews from the Former USSR et al. by *Nancy Morawetz;* for the Lawyers Committee for Human Rights by *Seth M. M. Stodder;* for the American Civil Liberties Union et al. by *Judy Rabinovitz, Lucas Guttentag, Steven R. Shapiro, Wanyong Lai Austin, Jayashri Srikantiah,* and *Aaron H. Caplan;* for Human Rights Watch et al. by *William J. Aceves* and *Paul L. Hoffman;* and for Carolyn Patty Blum et al. by *George A. Cumming, Jr.,* and *Charles D. Weisselberg.*

JUSTICE BREYER delivered the opinion of the Court.

When an alien has been found to be unlawfully present in the United States and a final order of removal has been entered, the Government ordinarily secures the alien's removal during a subsequent 90-day statutory "removal period," during which time the alien normally is held in custody.

A special statute authorizes further detention if the Government fails to remove the alien during those 90 days. It says:

> "An alien ordered removed [1] who is inadmissible . . . [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision . . . ." 8 U. S. C. § 1231(a)(6) (1994 ed., Supp. V).

In these cases, we must decide whether this post-removal-period statute authorizes the Attorney General to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal. We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question. See *infra*, at 693–694. Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit "reasonable time" limitation, the application of which is subject to federal-court review.

I

A

The post-removal-period detention statute is one of a related set of statutes and regulations that govern detention during and after removal proceedings. While removal proceedings are in progress, most aliens may be released on bond or paroled. 66 Stat. 204, as added and amended, 110 Stat. 3009–585, 8 U. S. C. §§ 1226(a)(2), (c) (1994 ed., Supp. V). After entry of a final removal order and during the 90-day removal period, however, aliens must be held in custody. § 1231(a)(2). Subsequently, as the post-removal-period statute provides, the Government "may" continue to detain an alien who still remains here or release that alien under supervision. § 1231(a)(6).

Related Immigration and Naturalization Service (INS) regulations add that the INS District Director will initially review the alien's records to decide whether further detention or release under supervision is warranted after the 90-day removal period expires. 8 CFR §§ 241.4(c)(1), (h), (k)(1)(i) (2001). If the decision is to detain, then an INS panel will review the matter further, at the expiration of a 3-month period or soon thereafter. § 241.4(k)(2)(ii). And the panel will decide, on the basis of records and a possible personal interview, between still further detention or release under supervision. § 241.4(i). In making this decision, the panel will consider, for example, the alien's disciplinary record, criminal record, mental health reports, evidence of rehabilitation, history of flight, prior immigration history, and favorable factors such as family ties. § 241.4(f). To authorize release, the panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release. § 241.4(e). And the alien must demonstrate "to the satisfaction of the Attorney General" that he will pose no danger or risk of flight.

§ 241.4(d)(1). If the panel decides against release, it must review the matter again within a year, and can review it earlier if conditions change. §§ 241.4(k)(2)(iii), (v).

B

1

We consider two separate instances of detention. The first concerns Kestutis Zadvydas, a resident alien who was born, apparently of Lithuanian parents, in a displaced persons camp in Germany in 1948. When he was eight years old, Zadvydas immigrated to the United States with his parents and other family members, and he has lived here ever since.

Zadvydas has a long criminal record, involving drug crimes, attempted robbery, attempted burglary, and theft. He has a history of flight, from both criminal and deportation proceedings. Most recently, he was convicted of possessing, with intent to distribute, cocaine; sentenced to 16 years' imprisonment; released on parole after two years; taken into INS custody; and, in 1994, ordered deported to Germany. See 8 U. S. C. § 1251(a)(2) (1988 ed., Supp. V) (delineating crimes that make alien deportable).

In 1994, Germany told the INS that it would not accept Zadvydas because he was not a German citizen. Shortly thereafter, Lithuania refused to accept Zadvydas because he was neither a Lithuanian citizen nor a permanent resident. In 1996, the INS asked the Dominican Republic (Zadvydas' wife's country) to accept him, but this effort proved unsuccessful. In 1998, Lithuania rejected, as inadequately documented, Zadvydas' effort to obtain Lithuanian citizenship based on his parents' citizenship; Zadvydas' reapplication is apparently still pending.

The INS kept Zadvydas in custody after expiration of the removal period. In September 1995, Zadvydas filed a petition for a writ of habeas corpus under 28 U. S. C. § 2241 chal-

lenging his continued detention. In October 1997, a Federal District Court granted that writ and ordered him released under supervision. *Zadvydas* v. *Caplinger*, 986 F. Supp. 1011, 1027–1028 (ED La.). In its view, the Government would never succeed in its efforts to remove Zadvydas from the United States, leading to his permanent confinement, contrary to the Constitution. *Id.*, at 1027.

The Fifth Circuit reversed this decision. *Zadvydas* v. *Underdown*, 185 F. 3d 279 (1999). It concluded that Zadvydas' detention did not violate the Constitution because eventual deportation was not "impossible," good-faith efforts to remove him from the United States continued, and his detention was subject to periodic administrative review. *Id.*, at 294, 297. The Fifth Circuit stayed its mandate pending potential review in this Court.

2

The second case is that of Kim Ho Ma. Ma was born in Cambodia in 1977. When he was two, his family fled, taking him to refugee camps in Thailand and the Philippines and eventually to the United States, where he has lived as a resident alien since the age of seven. In 1995, at age 17, Ma was involved in a gang-related shooting, convicted of manslaughter, and sentenced to 38 months' imprisonment. He served two years, after which he was released into INS custody.

In light of his conviction of an "aggravated felony," Ma was ordered removed. See 8 U. S. C. §§ 1101(a)(43)(F) (defining certain violent crimes as aggravated felonies), 1227(a)(2)(A)(iii) (1994 ed., Supp. IV) (aliens convicted of aggravated felonies are deportable). The 90-day removal period expired in early 1999, but the INS continued to keep Ma in custody, because, in light of his former gang membership, the nature of his crime, and his planned participation in a prison hunger strike, it was "unable to conclude that

Mr. Ma would remain nonviolent and not violate the conditions of release." App. to Pet. for Cert. in No. 00–38, p. 87a.

In 1999, Ma filed a petition for a writ of habeas corpus under 28 U. S. C. § 2241. A panel of five judges in the Federal District Court for the Western District of Washington, considering Ma's and about 100 similar cases together, issued a joint order holding that the Constitution forbids post-removal-period detention unless there is "a realistic chance that [the] alien will be deported" (thereby permitting classification of the detention as "in aid of deportation"). *Binh Phan* v. *Reno*, 56 F. Supp. 2d 1149, 1156 (1999). The District Court then held an evidentiary hearing, decided that there was no "realistic chance" that Cambodia (which has no repatriation treaty with the United States) would accept Ma, and ordered Ma released. App. to Pet. for Cert. in No. 00–38, at 60a–61a.

The Ninth Circuit affirmed Ma's release. *Kim Ho Ma* v. *Reno*, 208 F. 3d 815 (2000). It concluded, based in part on constitutional concerns, that the statute did not authorize detention for more than a "reasonable time" beyond the 90-day period authorized for removal. *Id.*, at 818. And, given the lack of a repatriation agreement with Cambodia, that time had expired upon passage of the 90 days. *Id.*, at 830–831.

3

Zadvydas asked us to review the decision of the Fifth Circuit authorizing his continued detention. The Government asked us to review the decision of the Ninth Circuit forbidding Ma's continued detention. We granted writs in both cases, agreeing to consider both statutory and related constitutional questions. See also *Duy Dac Ho* v. *Greene*, 204 F. 3d 1045, 1060 (CA10 2000) (upholding Attorney General's statutory and constitutional authority to detain alien indefinitely). We consolidated the two cases for argument; and we now decide them together.

## II

We note at the outset that the primary federal habeas corpus statute, 28 U. S. C. § 2241, confers jurisdiction upon the federal courts to hear these cases. See § 2241(c)(3) (authorizing any person to claim in federal court that he or she is being held "in custody in violation of the Constitution or laws . . . of the United States"). Before 1952, the federal courts considered challenges to the lawfulness of immigration-related detention, including challenges to the validity of a deportation order, in habeas proceedings. See *Heikkila* v. *Barber,* 345 U. S. 229, 230, 235–236 (1953). Beginning in 1952, an alternative method for review of *deportation orders,* namely, actions brought in federal district court under the Administrative Procedure Act (APA), became available. See *Shaughnessy* v. *Pedreiro,* 349 U. S. 48, 51–52 (1955). And in 1961 Congress replaced district court APA review with initial *deportation order* review in courts of appeals. See Act of Sept. 26, 1961, § 5, 75 Stat. 651 (formerly codified at 8 U. S. C. § 1105a(a)) (repealed 1996). The 1961 Act specified that federal habeas courts were also available to hear statutory and constitutional challenges to *deportation* (and exclusion) *orders.* See 8 U. S. C. §§ 1105a(a)(10), (b) (repealed 1996). These statutory changes left habeas untouched as the basic method for obtaining review of continued *custody after* a deportation order had become final. See *Cheng Fan Kwok* v. *INS,* 392 U. S. 206, 212, 215–216 (1968) (holding that § 1105a(a) applied only to challenges to determinations made during deportation proceedings and motions to reopen those proceedings).

More recently, Congress has enacted several statutory provisions that limit the circumstances in which judicial review of deportation decisions is available. But none applies here. One provision, 8 U. S. C. § 1231(h) (1994 ed., Supp. V), simply forbids courts to construe *that section* "to create any . . . procedural right or benefit that is legally enforce-

able"; it does not deprive an alien of the right to rely on 28 U. S. C. § 2241 to challenge detention that is without statutory authority.

Another provision, 8 U. S. C. § 1252(a)(2)(B)(ii) (1994 ed., Supp. V), says that "no court shall have jurisdiction to review" decisions "specified . . . to be in the discretion of the Attorney General." The aliens here, however, do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion. See also, e. g., § 1226(e) (applicable to certain detention-related decisions *in period preceding entry* of final removal order); § 1231(a)(4)(D) (applicable to assertion of causes or claims *under § 1231(a)(4)*, which is not at issue here); §§ 1252(a)(1), (a)(2)(C) (applicable to judicial review of "final order[s] of removal"); § 1252(g) (applicable to decisions "to commence proceedings, adjudicate cases, or execute removal orders").

We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention. And we turn to the merits of the aliens' claims.

## III

The post-removal-period detention statute applies to certain categories of aliens who have been ordered removed, namely, inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for certain national security or foreign relations reasons, as well as any alien "who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." 8 U. S. C. § 1231(a)(6) (1994 ed., Supp. V); see also 8 CFR § 241.4(a) (2001). It says that an alien who falls into one of these cate-

gories "may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision." 8 U. S. C. § 1231(a)(6) (1994 ed., Supp. V).

The Government argues that the statute means what it literally says. It sets no "limit on the length of time beyond the removal period that an alien who falls within one of the Section 1231(a)(6) categories may be detained." Brief for Petitioners in No. 00–38, p. 22. Hence, "whether to continue to detain such an alien and, if so, in what circumstances and for how long" is up to the Attorney General, not up to the courts. *Ibid.*

"[I]t is a cardinal principle" of statutory interpretation, however, that when an Act of Congress raises "a serious doubt" as to its constitutionality, "this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); see also *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 78 (1994); *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916); cf. *Almendarez-Torres* v. *United States*, 523 U. S. 224, 238 (1998) (construction of statute that avoids invalidation best reflects congressional will). We have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation. See *United States* v. *Witkovich*, 353 U. S. 194, 195, 202 (1957) (construing a grant of authority to the Attorney General to ask aliens whatever questions he "deem[s] fit and proper" as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue"). For similar reasons, we read an implicit limitation into the statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention.

A

A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law." Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects. See *Foucha* v. *Louisiana*, 504 U. S. 71, 80 (1992). And this Court has said that government detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, see *United States* v. *Salerno*, 481 U. S. 739, 746 (1987), or, in certain special and "narrow" nonpunitive "circumstances," *Foucha, supra,* at 80, where a special justification, such as harm-threatening mental illness, outweighs the "individual's constitutionally protected interest in avoiding physical restraint." *Kansas* v. *Hendricks*, 521 U. S. 346, 356 (1997).

The proceedings at issue here are civil, not criminal, and we assume that they are nonpunitive in purpose and effect. There is no sufficiently strong special justification here for indefinite civil detention—at least as administered under this statute. The statute, says the Government, has two regulatory goals: "ensuring the appearance of aliens at future immigration proceedings" and "[p]reventing danger to the community." Brief for Respondents in No. 99–7791, p. 24. But by definition the first justification—preventing flight—is weak or nonexistent where removal seems a remote possibility at best. As this Court said in *Jackson* v. *Indiana*, 406 U. S. 715 (1972), where detention's goal is no longer practically attainable, detention no longer "bear[s] [a] reasonable relation to the purpose for which the individual [was] committed." *Id.*, at 738.

The second justification—protecting the community—does not necessarily diminish in force over time. But we have

upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections. Compare *Hendricks, supra,* at 368 (upholding scheme that imposes detention upon "a small segment of particularly dangerous individuals" and provides "strict procedural safeguards"), and *Salerno, supra,* at 747, 750–752 (in upholding pretrial detention, stressing "stringent time limitations," the fact that detention is reserved for the "most serious of crimes," the requirement of proof of dangerousness by clear and convincing evidence, and the presence of judicial safeguards), with *Foucha, supra,* at 81–83 (striking down insanity-related detention system that placed burden on detainee to prove nondangerousness). In cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger. See *Hendricks, supra,* at 358, 368.

The civil confinement here at issue is not limited, but potentially permanent. Cf. *Salerno, supra,* at 747 (noting that "maximum length of pretrial detention is limited" by "stringent" requirements); *Carlson* v. *Landon,* 342 U. S. 524, 545–546 (1952) (upholding temporary detention of alien during deportation proceeding while noting that "problem of . . . unusual delay" was not present). The provision authorizing detention does not apply narrowly to "a small segment of particularly dangerous individuals," *Hendricks, supra,* at 368, say, suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations. See 8 U. S. C. § 1231(a)(6) (1994 ed., Supp. V) (referencing § 1227(a)(1)(C)); cf. *Hendricks,* 521 U. S., at 357–358 (only individuals with "past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future" may be detained). And, once the flight risk justification evaporates, the only special cir-

cumstance present is the alien's removable status itself, which bears no relation to a detainee's dangerousness. Cf. *id.*, at 358; *Foucha, supra,* at 82.

Moreover, the sole procedural protections available to the alien are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (in the Government's view) significant later judicial review. Compare 8 CFR § 241.4(d)(1) (2001) (imposing burden of proving nondangerousness upon alien) with *Foucha, supra,* at 82 (striking down insanity-related detention for that very reason). This Court has suggested, however, that the Constitution may well preclude granting "an administrative body the unreviewable authority to make determinations implicating fundamental rights." *Superintendent, Mass. Correctional Institution at Walpole* v. *Hill,* 472 U. S. 445, 450 (1985) (O'CONNOR, J.); see also *Crowell,* 285 U. S., at 87 (Brandeis, J., dissenting) ("[U]nder certain circumstances, the constitutional requirement of due process is a requirement of judicial process"). The Constitution demands greater procedural protection even for property. See *South Carolina* v. *Regan,* 465 U. S. 367, 393 (1984) (O'CONNOR, J., concurring in judgment); *Phillips* v. *Commissioner,* 283 U. S. 589, 595–597 (1931) (Brandeis, J.). The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such protection is obvious.

The Government argues that, from a constitutional perspective, alien status itself can justify indefinite detention, and points to *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206 (1953), as support. That case involved a once lawfully admitted alien who left the United States, returned after a trip abroad, was refused admission, and was left on Ellis Island, indefinitely detained there because the Government could not find another country to accept him. The Court held that Mezei's detention did not violate the Constitution. *Id.,* at 215–216.

Although *Mezei,* like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. As the Court emphasized, the alien's extended departure from the United States required him to seek entry into this country once again. His presence on Ellis Island did not count as entry into the United States. Hence, he was "treated," for constitutional purposes, "as if stopped at the border." *Id.,* at 213, 215. And that made all the difference.

The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. See *Kaplan* v. *Tod,* 267 U. S. 228, 230 (1925) (despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States"); *Leng May Ma* v. *Barber,* 357 U. S. 185, 188–190 (1958) (alien "paroled" into the United States pending admissibility had not effected an "entry"). It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. See *United States* v. *Verdugo-Urquidez,* 494 U. S. 259, 269 (1990) (Fifth Amendment's protections do not extend to aliens outside the territorial boundaries); *Johnson* v. *Eisentrager,* 339 U. S. 763, 784 (1950) (same). But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent. See *Plyler* v. *Doe,* 457 U. S. 202, 210 (1982); *Mathews* v. *Diaz,* 426 U. S. 67, 77 (1976); *Kwong Hai Chew* v. *Colding,* 344 U. S. 590, 596–598, and n. 5 (1953); *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886); cf. *Mezei, supra,* at 212 ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"). Indeed, this Court has held that the Due Process

Clause protects an alien subject to a final order of deportation, see *Wong Wing* v. *United States,* 163 U. S. 228, 238 (1896), though the nature of that protection may vary depending upon status and circumstance, see *Landon* v. *Plasencia,* 459 U. S. 21, 32–34 (1982); *Johnson, supra,* at 770.

In *Wong Wing, supra,* the Court held unconstitutional a statute that imposed a year of hard labor upon aliens subject to a final deportation order. That case concerned substantive protections for aliens who had been ordered removed, not procedural protections for aliens whose removability was being determined. Cf. *post,* at 704 (SCALIA, J., dissenting). The Court held that punitive measures could not be imposed upon aliens ordered removed because "all persons within the territory of the United States are entitled to the protection" of the Constitution. 163 U. S., at 238 (citing *Yick Wo, supra,* at 369 (holding that equal protection guarantee applies to Chinese aliens)); see also *Witkovich,* 353 U. S., at 199, 201 (construing statute which applied to aliens ordered deported in order to avoid substantive constitutional problems). And contrary to JUSTICE SCALIA's characterization, see *post,* at 703–705, in *Mezei* itself, both this Court's rejection of Mezei's challenge to the procedures by which he was deemed excludable and its rejection of his challenge to continued detention rested upon a basic territorial distinction. See *Mezei, supra,* at 215 (holding that Mezei's presence on Ellis Island was not "considered a landing" and did "not affec[t]" his legal or constitutional status (internal quotation marks omitted)).

In light of this critical distinction between *Mezei* and the present cases, *Mezei* does not offer the Government significant support, and we need not consider the aliens' claim that subsequent developments have undermined *Mezei*'s legal authority. See Brief for Petitioner in No. 99–7791, p. 23; Brief for Respondent in No. 00–38, pp. 16–17; Brief for Lawyers' Committee for Human Rights as *Amicus Curiae* in No. 00–38, pp. 15–20. Nor are we aware of any other authority that would support JUSTICE KENNEDY's limitation of

due process protection for removable aliens to freedom from detention that is arbitrary or capricious. See *post*, at 717–722 (dissenting opinion).

The Government also looks for support to cases holding that Congress has "plenary power" to create immigration law, and that the Judicial Branch must defer to Executive and Legislative Branch decisionmaking in that area. Brief for Respondents in No. 99–7791, at 17, 20 (citing *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588–589 (1952)). But that power is subject to important constitutional limitations. See *INS* v. *Chadha*, 462 U. S. 919, 941–942 (1983) (Congress must choose "a constitutionally permissible means of implementing" that power); *The Chinese Exclusion Case*, 130 U. S. 581, 604 (1889) (congressional authority limited "by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations"). In these cases, we focus upon those limitations. In doing so, we nowhere deny the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions. See 8 U. S. C. § 1231(a)(3) (1994 ed., Supp. V) (granting authority to Attorney General to prescribe regulations governing supervision of aliens not removed within 90 days); § 1253 (imposing penalties for failure to comply with release conditions). The question before us is not one of "'confer[ring] on those admitted the right to remain against the national will'" or "'sufferance of aliens'" who should be removed. *Post*, at 703 (SCALIA, J., dissenting) (emphasis deleted) (quoting *Mezei*, 345 U. S., at 222–223 (Jackson, J., dissenting)). Rather, the issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States.

Nor do the cases before us require us to consider the political branches' authority to control entry into the United States. Hence we leave no "unprotected spot in the Na-

tion's armor." *Kwong Hai Chew,* 344 U. S., at 602. Neither do we consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security. The sole foreign policy consideration the Government mentions here is the concern lest courts interfere with "sensitive" repatriation negotiations. Brief for Respondents in No. 99–7791, at 21. But neither the Government nor the dissents explain how a habeas court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity, could make a significant difference in this respect. See *infra,* at 699–700.

Finally, the Government argues that, whatever liberty interest the aliens possess, it is "greatly diminished" by their lack of a legal right to "liv[e] at large in this country." Brief for Respondents in No. 99–7791, at 47; see also *post,* at 703 (SCALIA, J., dissenting) (characterizing right at issue as "right to release into this country"). The choice, however, is not between imprisonment and the alien "living at large." Brief for Respondents in No. 99–7791, at 47. It is between imprisonment and supervision under release conditions that may not be violated. See *supra,* at 695 (citing 8 U. S. C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V)); 8 CFR § 241.5 (2001) (establishing conditions of release after removal period). And, for the reasons we have set forth, we believe that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, irrespective of the procedures used, cf. *post,* at 722–724 (KENNEDY, J., dissenting), the Constitution permits detention that is indefinite and potentially permanent.

## B

Despite this constitutional problem, if "Congress has made its intent" in the statute "clear, 'we must give effect to that intent.'" *Miller* v. *French,* 530 U. S. 327, 336 (2000) (quoting *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195, 215 (1962)).

We cannot find here, however, any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed. And that is so whether protecting the community from dangerous aliens is a primary or (as we believe) secondary statutory purpose. Cf. *post*, at 706, 708–709 (KENNEDY, J., dissenting). After all, the provision is part of a statute that has as its basic purpose effectuating an alien's removal. Why should we assume that Congress saw the alien's dangerousness as unrelated to this purpose?

The Government points to the statute's word "may." But while "may" suggests discretion, it does not necessarily suggest unlimited discretion. In that respect the word "may" is ambiguous. Indeed, if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms. Cf. 8 U. S. C. § 1537(b)(2)(C) (1994 ed., Supp. V) ("If no country is willing to receive" a terrorist alien ordered removed, "the Attorney General may, notwithstanding any other provision of law, retain the alien in custody" and must review the detention determination every six months).

The Government points to similar related statutes that *require* detention of criminal aliens during removal proceedings and the removal period, and argues that these show that mandatory detention is the rule while discretionary release is the narrow exception. See Brief for Petitioners in No. 00–38, at 26–28 (citing 8 U. S. C. §§ 1226(c), 1231(a)(2)). But the statute before us applies not only to terrorists and criminals, but also to ordinary visa violators, see *supra*, at 691; and, more importantly, post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point.

The Government also points to the statute's history. That history catalogs a series of changes, from an initial period (before 1952) when lower courts had interpreted statutory

silence, Immigration Act of 1917, ch. 29, §§ 19, 20, 39 Stat. 889, 890, to mean that deportation-related detention must end within a reasonable time, *Spector* v. *Landon*, 209 F. 2d 481, 482 (CA9 1954) (collecting cases); *United States ex rel. Doukas* v. *Wiley*, 160 F. 2d 92, 95 (CA7 1947); *United States ex rel. Ross* v. *Wallis*, 279 F. 401, 403–404 (CA2 1922), to a period (from the early 1950's through the late 1980's) when the statutes permitted, but did not require, post-deportation-order detention for up to six months, Immigration and Nationality Act of 1952, § 242(c), 66 Stat. 210, 8 U. S. C. §§ 1252(c), (d) (1982 ed.); *Witkovich*, 353 U. S., at 198, to more recent statutes that have at times mandated and at other times permitted the post-deportation-order detention of aliens falling into certain categories such as aggravated felons, Anti-Drug Abuse Act of 1988, § 7343(a), 102 Stat. 4470, 8 U. S. C. § 1252(a)(2) (mandating detention); Immigration Act of 1990, § 504(a), 104 Stat. 5049–5050, 8 U. S. C. §§ 1252(a)(2)(A), (B) (permitting release under certain circumstances); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 306(a)(4), 105 Stat. 1751, 8 U. S. C. § 1252(a)(2)(B) (same).

In early 1996, Congress explicitly expanded the group of aliens subject to mandatory detention, eliminating provisions that permitted release of criminal aliens who had at one time been lawfully admitted to the United States. Antiterrorism and Effective Death Penalty Act of 1996, § 439(c), 110 Stat. 1277. And later that year Congress enacted the present law, which liberalizes pre-existing law by shortening the removal period from six months to 90 days, mandates detention of certain criminal aliens during the removal proceedings and for the subsequent 90-day removal period, and adds the post-removal-period provision here at issue. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C, §§ 303, 305, 110 Stat. 3009–585, 3009–598 to 3009–599; 8 U. S. C. §§ 1226(c), 1231(a) (1994 ed., Supp. V).

We have found nothing in the history of these statutes that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Consequently, interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute. See 1 E. Coke, Institutes *70b ("*Cessante ratione legis cessat ipse lex*") (the rationale of a legal rule no longer being applicable, that rule itself no longer applies).

## IV

The Government seems to argue that, even under our interpretation of the statute, a federal habeas court would have to accept the Government's view about whether the implicit statutory limitation is satisfied in a particular case, conducting little or no independent review of the matter. In our view, that is not so. Whether a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or is not, pursuant to statutory authority. The basic federal habeas corpus statute grants the federal courts authority to answer that question. See 28 U. S. C. § 2241(c)(3) (granting courts authority to determine whether detention is "in violation of the . . . laws . . . of the United States"). In doing so the courts carry out what this Court has described as the "historic purpose of the writ," namely, "to relieve detention by executive authorities without judicial trial." *Brown* v. *Allen*, 344 U. S. 443, 533 (1953) (Jackson, J., concurring in result).

In answering that basic question, the habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no

longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those, conditions. See *supra*, at 695 (citing 8 U. S. C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V); 8 CFR § 241.5 (2001)). And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period. See *supra*, at 690–692.

We recognize, as the Government points out, that review must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to "speak with one voice" in immigration matters. Brief for Respondents in No. 99–7791, at 19. But we believe that courts can take appropriate account of such matters without abdicating their legal responsibility to review the lawfulness of an alien's continued detention.

Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility. They counsel judges to give expert agencies decisionmaking leeway in matters that invoke their expertise. See *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 651–652 (1990). They recognize Executive Branch primacy in foreign policy matters. See *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 196 (1983). And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise.

We realize that recognizing this necessary Executive leeway will often call for difficult judgments. In order to limit

the occasions when courts will need to make them, we think it practically necessary to recognize some presumptively reasonable period of detention. We have adopted similar presumptions in other contexts to guide lower court determinations. See *Cheff* v. *Schnackenberg*, 384 U. S. 373, 379–380 (1966) (plurality opinion) (adopting rule, based on definition of "petty offense" in United States Code, that right to jury trial extends to all cases in which sentence of six months or greater is imposed); *County of Riverside* v. *McLaughlin*, 500 U. S. 44, 56–58 (1991) (O'CONNOR, J.) (adopting presumption, based on lower court estimate of time needed to process arrestee, that 48-hour delay in probable-cause hearing after arrest is reasonable, hence constitutionally permissible).

While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. See Juris. Statement in *United States* v. *Witkovich*, O. T. 1956, No. 295, pp. 8–9. Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

## V

The Fifth Circuit held Zadvydas' continued detention lawful as long as "good faith efforts to effectuate . . . deportation continue" and Zadvydas failed to show that deportation will prove "impossible." 185 F. 3d, at 294, 297. But this standard would seem to require an alien seeking release to show the absence of *any* prospect of removal—no matter how unlikely or unforeseeable—which demands more than our reading of the statute can bear. The Ninth Circuit held that the Government was required to release Ma from detention because there was no reasonable likelihood of his removal in the foreseeable future. 208 F. 3d, at 831. But its conclusion may have rested solely upon the "absence" of an "extant or pending" repatriation agreement without giving due weight to the likelihood of successful future negotiations. See *id.*, at 831, and n. 30. Consequently, we vacate the judgments below and remand both cases for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

I join Part I of JUSTICE KENNEDY's dissent, which establishes the Attorney General's clear statutory authority to detain criminal aliens with no specified time limit. I write separately because I do not believe that, as JUSTICE KENNEDY suggests in Part II of his opinion, there may be some situations in which the courts can order release. I believe that in both *Zadvydas* v. *Davis*, No. 99–7791, and *Ashcroft* v. *Ma*, No. 00–38, a "careful description" of the substantive right claimed, *Reno* v. *Flores*, 507 U. S. 292, 302 (1993), suffices categorically to refute its existence. A criminal alien under final order of removal who allegedly will not be accepted by any other country in the reasonably foreseeable future claims a constitutional right of supervised release into the United States. This claim can be repackaged as freedom

from "physical restraint" or freedom from "indefinite detention," *ante*, at 689, 690, but it is at bottom a claimed right of release into this country by an individual who *concededly* has no legal right to be here. There is no such constitutional right.

Like a criminal alien under final order of removal, an inadmissible alien at the border has no right to be in the United States. *The Chinese Exclusion Case*, 130 U. S. 581, 603 (1889). In *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206 (1953), we upheld potentially indefinite detention of such an inadmissible alien whom the Government was unable to return anywhere else. We said that "we [did] not think that respondent's continued exclusion deprives him of any statutory or constitutional right." *Id.*, at 215. While four Members of the Court thought that Mezei deserved greater procedural protections (the Attorney General had refused to divulge any information as to why Mezei was being detained, *id.*, at 209), no Justice asserted that Mezei had a substantive constitutional right to release into this country. And Justice Jackson's dissent, joined by Justice Frankfurter, affirmatively asserted the opposite, with no contradiction from the Court: "Due process does not invest any alien with a right to enter the United States, *nor confer on those admitted the right to remain against the national will.* Nothing in the Constitution requires admission *or sufferance* of aliens hostile to our scheme of government." *Id.*, at 222–223 (emphasis added). Insofar as a claimed legal right to release into this country is concerned, an alien under final order of removal stands on an equal footing with an inadmissible alien at the threshold of entry: He has no such right.

The Court expressly declines to apply or overrule *Mezei*, *ante*, at 694, but attempts to distinguish it—or, I should rather say, to obscure it in a legal fog. First, the Court claims that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Ante*, at 693. True enough, but only where that distinction makes perfect

sense: with regard to the question of what *procedures* are necessary to prevent entry, as opposed to what *procedures* are necessary to eject a person already in the United States. See, *e. g., Landon* v. *Plasencia,* 459 U. S. 21, 32 (1982) ("Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing *when threatened with deportation*" (emphasis added)).   The Court's citation of *Wong Wing* v. *United States,* 163 U. S. 228 (1896), for the proposition that we have "held that the Due Process Clause protects an alien subject to a final order of deportation," *ante,* at 693–694, is arguably relevant.   That case at least involved aliens under final order of deportation.*   But all it held is that they could not be subjected to the punishment of hard labor without a judicial trial.   I am sure they cannot be tortured, as well—but neither prohibition has anything to do with their right to be released into the United States. Nor does *Wong Wing* show that the rights of detained aliens subject to final order of deportation are different from the rights of aliens arrested and detained at the border—unless the Court believes that the detained alien in *Mezei could* have been set to hard labor.

*Mezei* thus stands unexplained and undistinguished by the Court's opinion.   We are offered no justification why an alien under a valid and final order of removal—which has *totally extinguished* whatever right to presence in this country he possessed—has any greater due process right to be released into the country than an alien at the border seeking entry.

---

*The Court also cites *Landon* v. *Plasencia,* 459 U. S. 21 (1982), as oblique support for the claim that the due process protection afforded aliens under final order of removal "may vary depending upon status and circumstance." *Ante,* at 694.   But that case is entirely inapt because it did not involve an alien subject to a final order of deportation.   The Court also cites *Johnson* v. *Eisentrager,* 339 U. S. 763, 770 (1950), *ante,* at 694, but that case is doubly irrelevant: because it dealt not with deportation but with the military's detention of enemy aliens outside the territorial jurisdiction of the United States, and because it rejected habeas corpus jurisdiction anyway.

Congress undoubtedly thought that both groups of aliens—
inadmissible aliens at the threshold and criminal aliens under
final order of removal—could be constitutionally detained on
the same terms, since it provided the authority to detain
both groups in the very same statutory provision, see 8
U. S. C. § 1231(a)(6). Because I believe *Mezei* controls these
cases, and, like the Court, I also see no reason to reconsider
*Mezei*, I find no constitutional impediment to the discretion
Congress gave to the Attorney General. JUSTICE KENNE-
DY's dissent explains the clarity of the detention provision,
and I see no obstacle to following the statute's plain meaning.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins,
and with whom JUSTICE SCALIA and JUSTICE THOMAS join
as to Part I, dissenting.

The Court says its duty is to avoid a constitutional ques-
tion. It deems the duty performed by interpreting a statute
in obvious disregard of congressional intent; curing the re-
sulting gap by writing a statutory amendment of its own;
committing its own grave constitutional error by arrogating
to the Judicial Branch the power to summon high officers of
the Executive to assess their progress in conducting some of
the Nation's most sensitive negotiations with foreign powers;
and then likely releasing into our general population at least
hundreds of removable or inadmissible aliens who have been
found by fair procedures to be flight risks, dangers to the
community, or both. Far from avoiding a constitutional
question, the Court's ruling causes systemic dislocation in
the balance of powers, thus raising serious constitutional
concerns not just for the cases at hand but for the Court's
own view of its proper authority. Any supposed respect the
Court seeks in not reaching the constitutional question is
outweighed by the intrusive and erroneous exercise of its
own powers. In the guise of judicial restraint the Court
ought not to intrude upon the other branches. The constitu-
tional question the statute presents, it must be acknowl-

edged, may be a significant one in some later case; but it ought not to drive us to an incorrect interpretation of the statute. The Court having reached the wrong result for the wrong reason, this respectful dissent is required.

I

The Immigration and Nationality Act (INA), 8 U. S. C. § 1101 *et seq.* (1994 ed. and Supp. V), is straightforward enough. It provides:

> "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." 8 U. S. C. § 1231(a)(6) (1994 ed., Supp. V).

By this statute, Congress confers upon the Attorney General discretion to detain an alien ordered removed. It gives express authorization to detain "beyond the removal period." *Ibid.* The class of removed aliens detainable under the section includes aliens who were inadmissible and aliens subject to final orders of removal, provided they are a risk to the community or likely to flee. The issue to be determined is whether the authorization to detain beyond the removal period is subject to the implied, nontextual limitation that the detention be no longer than reasonably necessary to effect removal to another country. The majority invokes the canon of constitutional doubt to read that implied term into the statute. One can accept the premise that a substantial constitutional question is presented by the prospect of lengthy, even unending, detention in some instances; but the statutory construction the Court adopts should be rejected in any event. The interpretation has no basis in the lan-

guage or structure of the INA and in fact contradicts and defeats the purpose set forth in the express terms of the statutory text.

The Court, it is submitted, misunderstands the principle of constitutional avoidance which it seeks to invoke. The majority gives a brief bow to the rule that courts must respect the intention of Congress, *ante,* at 696, but then waltzes away from any analysis of the language, structure, or purpose of the statute. Its analysis is not consistent with our precedents explaining the limits of the constitutional doubt rule. The rule allows courts to choose among constructions which are "fairly possible," *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932), not to "'press statutory construction to the point of disingenuous evasion even to avoid a constitutional question,'" *Salinas* v. *United States,* 522 U. S. 52, 60 (1997) (quoting *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 57, n. 9 (1996)). Were a court to find two interpretations of equal plausibility, it should choose the construction that avoids confronting a constitutional question. The majority's reading of the statutory authorization to "detai[n] beyond the removal period," however, is not plausible. An interpretation which defeats the stated congressional purpose does not suffice to invoke the constitutional doubt rule, for it is "plainly contrary to the intent of Congress." *United States* v. *X-Citement Video, Inc.,* 513 U. S. 64, 78 (1994). The majority announces it will reject the Government's argument "that the statute means what it literally says," *ante,* at 689, but then declines to offer any other acceptable textual interpretation. The majority does not demonstrate an ambiguity in the delegation of the detention power to the Attorney General. It simply amends the statute to impose a time limit tied to the progress of negotiations to effect the aliens' removal. The statute cannot be so construed. The requirement the majority reads into the law simply bears no relation to the text; and in fact it defeats the statutory purpose and design.

Other provisions in § 1231 itself do link the requirement of a reasonable time period to the removal process. See, e. g., § 1231(c)(1)(A) (providing that an alien who arrives at a port of entry "shall be removed immediately on a vessel or aircraft" unless "it is impracticable" to do so "within a *reasonable* time" (emphasis added)); § 1231(c)(3)(A)(ii)(II) (requiring the "owner of a vessel or aircraft bringing an alien to the United States [to] pay the costs of detaining and maintaining the alien . . . for the period of time *reasonably necessary* for the owner to arrange for repatriation" (emphasis added)). That Congress chose to impose the limitation in these sections and not in § 1231(a)(6) is evidence of its intent to measure the detention period by other standards. When Congress has made express provisions for the contingency that repatriation might be difficult or prolonged in other portions of the statute, it should be presumed that its omission of the same contingency in the detention section was purposeful. Indeed, the reasonable time limits in the provisions just mentioned simply excuse the duty of early removal. They do not mandate release. An alien within one of these categories, say, a ship stowaway, would be subject as well to detention beyond the removal period under § 1231(a)(6), if the statute is read as written. Under the majority's view, however, it appears the alien must be released in six months even if presenting a real danger to the community.

The 6-month period invented by the Court, even when modified by its sliding standard of reasonableness for certain repatriation negotiations, see *ante*, at 701, makes the statutory purpose to protect the community ineffective. The risk to the community exists whether or not the repatriation negotiations have some end in sight; in fact, when the negotiations end, the risk may be greater. The authority to detain beyond the removal period is to protect the community, not to negotiate the aliens' return. The risk to the community survives repatriation negotiations. To a more limited, but still significant, extent, so does the concern with flight. It

is a fact of international diplomacy that governments and their policies change; and if repatriation efforts can be revived, the Attorney General has an interest in ensuring the alien can report so the removal process can begin again.

Congress, moreover, was well aware of the difficulties confronting aliens who are removable but who cannot be repatriated. It made special provisions allowing them to be employed, a privilege denied to other deportable aliens. See § 1231(a)(7) (providing an "alien [who] cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien" still remains eligible for employment in the United States). Congress' decision to ameliorate the condition of aliens subject to a final order of removal who cannot be repatriated, but who need not be detained, illustrates a balance in the statutory design. Yet the Court renders the other side of the balance meaningless. The risk to the community posed by a removable alien is a function of a variety of circumstances, circumstances that do not diminish just because the alien cannot be deported within some foreseeable time. Those circumstances include the seriousness of the alien's past offenses, his or her efforts at rehabilitation, and some indication from the alien that, given the real prospect of detention, the alien will conform his or her conduct. This is the purpose for the periodic review of detention status provided for by the regulations. See 8 CFR § 241.4 (2001). The Court's amendment of the statute reads out of the provision the congressional decision that dangerousness alone is a sufficient basis for detention, see *ante*, at 699 (citing 1 E. Coke, Institutes *70b), and reads out as well any meaningful structure for supervised release.

The majority is correct to observe that in *United States* v. *Witkovich*, 353 U. S. 194 (1957), the Court "read significant limitations into" a statute, *ante*, at 689, but that does not permit us to avoid the proper reading of the enactment now before us. In *Witkovich*, the Court construed former § 1252(d), which required an alien under a final order of de-

portation "to give information under oath . . . as the Attorney General may deem fit and proper." 353 U. S., at 195. The Court held that although the plain language "appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of aliens whose deportation has not been effected within six months," *id.*, at 199, the constitutional doubt this interpretation would raise meant the language would be construed as limited to the provision of information "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue," *id.*, at 202. In *Witkovich* the interpretation of the text was in aid of the statutory purpose; in the instant cases the interpretation nullifies the statutory purpose. Here the statute by its own terms permits the Attorney General to consider factors the Court now makes irrelevant.

The majority's unanchored interpretation ignores another indication that the Attorney General's detention discretion was not limited to this truncated period. Section 1231(a)(6) permits continued detention not only of removable aliens but also of inadmissible aliens, for instance those stopped at the border before entry. Congress provides for detention of both categories within the same statutory grant of authority. Accepting the majority's interpretation, then, there are two possibilities, neither of which is sustainable. On the one hand, it may be that the majority's rule applies to both categories of aliens, in which case we are asked to assume that Congress intended to restrict the discretion it could confer upon the Attorney General so that all inadmissible aliens must be allowed into our community within six months. On the other hand, the majority's logic might be that inadmissible and removable aliens can be treated differently. Yet it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not to another. The text does not admit of this possibility. As a result, it is difficult to see why "[a]liens who have not yet gained initial admission

to this country would present a very different question."
*Ante,* at 682.

Congress' power to detain aliens in connection with removal or exclusion, the Court has said, is part of the Legislature's considerable authority over immigration matters. See, *e. g., Wong Wing* v. *United States,* 163 U. S. 228, 235 (1896) ("Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation"). It is reasonable to assume, then, and it is the proper interpretation of the INA and § 1231(a)(6), that when Congress provided for detention "beyond the removal period," it exercised its considerable power over immigration and delegated to the Attorney General the discretion to detain inadmissible and other removable aliens for as long as they are determined to be either a flight risk or a danger to the Nation.

The majority's interpretation, moreover, defeats the very repatriation goal in which it professes such interest. The Court rushes to substitute a judicial judgment for the Executive's discretion and authority. As the Government represents to us, judicial orders requiring release of removable aliens, even on a temporary basis, have the potential to undermine the obvious necessity that the Nation speak with one voice on immigration and foreign affairs matters. Brief for Respondents in No. 99–7791, p. 49. The result of the Court's rule is that, by refusing to accept repatriation of their own nationals, other countries can effect the release of these individuals back into the American community. *Ibid.* If their own nationals are now at large in the United States, the nation of origin may ignore or disclaim responsibility to accept their return. *Ibid.* The interference with sensitive foreign relations becomes even more acute where hostility or tension characterizes the relationship, for other countries can use the fact of judicially mandated release to their strategic advantage, refusing the return of their nation-

als to force dangerous aliens upon us. One of the more alarming aspects of the Court's new venture into foreign affairs management is the suggestion that the district court can expand or contract the reasonable period of detention based on its own assessment of the course of negotiations with foreign powers. The Court says it will allow the Executive to perform its duties on its own for six months; after that, foreign relations go into judicially supervised receivership.

The cases which the Court relies upon to support the imposition of presumptions are inapposite. The rule announced in *Cheff* v. *Schnackenberg*, 384 U. S. 373 (1966)—"that sentences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial"—was based on the definition of a "petty offense" that was still operable in the United States Code, and was proper "under the peculiar power of the federal courts to revise sentences in contempt cases." *Id.*, at 380. The majority can point to no similar statutory or judicial source for its authority to create its own time-based rule in these cases. It cites only an observation in a brief filed by the Government in *United States* v. *Witkovich*, O. T. 1956, No. 295, pp. 8–9, see *ante*, at 701, relying, in turn, on doubts expressed in a 1952 Senate Report concerning detention for longer than six months under an Act with standards different from, and far less precise than, those applicable here. In *County of Riverside* v. *McLaughlin*, 500 U. S. 44 (1991), our reasonableness presumption for delays of less than 48 hours between an arrest and a probable-cause hearing was, as the majority recognizes, *ante*, at 701, based on the "Court of Appeals' determination of the time required to complete those procedures." 500 U. S., at 57. Here, as far as we know, the 6-month period bears no particular relationship to how long it now takes to deport any group of aliens, or, for that matter, how long it took in the past to remove. Zadvydas' case itself demonstrates that the repatriation process may often take years to

negotiate, involving difficult issues of establishing citizenship and the like. See Brief for Petitioner in No. 99–7791, pp. 17–20.

It is to be expected that from time to time a foreign power will adopt a truculent stance with respect to the United States and other nations. Yet the Court by its time limit, or presumptive time limit, goes far to undercut the position of the Executive in repatriation negotiations, thus ill serving the interest of all foreign nationals of the country concerned. Law-abiding aliens might wish to return to their home country, for instance, but the strained relationship caused by the difficult repatriation talks might prove to be a substantial obstacle for these aliens as well.

In addition to weakening the hand of our Government, court ordered release cannot help but encourage dilatory and obstructive tactics by aliens who, emboldened by the Court's new rule, have good reason not to cooperate by making their own repatriation or transfer seem foreseeable. An alien ordered deported also has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an Immigration and Naturalization Service (INS) detention facility. Neither the alien nor his family would find any urgency in assisting with a petition to other countries to accept the alien back if the alien could simply remain in the United States indefinitely.

The risk to the community posed by the mandatory release of aliens who are dangerous or a flight risk is far from insubstantial; the motivation to protect the citizenry from aliens determined to be dangerous is central to the immigration power itself. The Government cites statistical studies showing high recidivism rates for released aliens. One Government Accounting Office study cited by Congress in floor debates on the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, put the figure as high as 77 percent. 142 Cong. Rec. 7972 (1996); Brief for Respondents in

No. 99–7791, at 27, n. 13. It seems evident a criminal record accumulated by an admitted alien during his or her time in the United States is likely to be a better indicator of risk than factors relied upon during the INS's initial decision to admit or exclude. Aliens ordered deported as the result of having committed a felony have proved to be dangerous.

Any suggestion that aliens who have completed prison terms no longer present a danger simply does not accord with the reality that a significant risk may still exist, as determined by the many factors set forth in the regulations. See 8 CFR § 241.4(f) (2001). Underworld and terrorist links are subtle and may be overseas, beyond our jurisdiction to impose felony charges. Furthermore, the majority's rationale seems to apply to an alien who flees prosecution or escapes from custody in some other country. The fact an alien can be deemed inadmissible because of fraud at the time of entry does not necessarily distinguish his or her case from an alien whose entry was legal. Consider, for example, a fugitive alien who enters by fraud or stealth and resides here for five years with significant ties to the community, though still presenting a danger; contrast him with an alien who entered lawfully but a month later committed an act making him removable. Why the Court's rationale should apply to the second alien but not the first is not apparent.

The majority cannot come to terms with these distinctions under its own rationale. The rule the majority creates permits consideration of nothing more than the reasonable foreseeability of removal. See *ante*, at 699–700. That standard is not only without sound basis in the statutory structure, but also is not susceptible to customary judicial inquiry. Cf. *INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 425 (1999) ("The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions"). The majority does say that the release of terrorists or other "special circumstances" might justify "heightened deference to the judgments of the politi-

cal branches with respect to matters of national security."
*Ante*, at 696. Here the Court appears to rely on an assessment of risk, but this is the very premise it finds inadequate to sustain the natural reading of the statute. The Court ought not to reject a rationale in order to deny power to the Attorney General and then invoke the same rationale to save its own analysis.

This rule of startling breadth invites potentially perverse results. Because other nations may refuse to admit aliens who have committed certain crimes—see, *e. g.,* Brief for Petitioner in No. 99–7791, at 19 ("Lithuanian law precludes granting of citizenship to persons who, before coming to Lithuania, have been sentenced in another state to imprisonment for a deliberate crime for which criminal liability is imposed by the laws of the Republic of Lithuania" (citations and internal quotation marks omitted))—often the aliens who have committed the most serious crimes will be those who may be released immediately under the majority's rule. An example is presented in the case of Saroeut Ourk, a Cambodian alien determined to be removable and held pending deportation. See *Ourk* v. *INS*, No. 00–35645 (CA9, Sept. 18, 2000), cert. pending, No. 00–987. Ourk was convicted of rape by use of drugs in conjunction with the kidnaping of a 13-year-old girl; after serving 18 months of his prison term, he was released on parole but was returned to custody twice more for parole violations. Pet. for Cert. in No. 00–987, pp. 4–5. When he was ordered deported and transferred to the custody of the INS, it is no surprise the INS determined he was both a flight risk and a danger to the community. Yet the Court of Appeals for the Ninth Circuit concluded, based on its earlier decision in *Kim Ho Ma* v. *Reno,* 208 F. 3d 815 (2000), that Ourk could no longer be held pending deportation, since removal to Cambodia was not reasonably foreseeable. App. to Pet. for Cert. in No. 00–987, pp. 3a–4a. See also *Phetsany* v. *INS*, No. 00–16286 (CA9, Sept. 18, 2000), cert. pending, No. 00–986 (requiring release of a native and

citizen of Laos convicted of attempted, premeditated murder); *Mounsaveng* v. *INS*, No. 00–15309 (CA9, Aug. 11, 2000), cert. pending, No. 00–75█ (releasing a citizen of Laos convicted of rape of a 15-year-old girl and reckless endangerment for involvement in a fight in which gunshots were fired); *Lim* v. *Reno*, No. 99–36191 (CA9, Aug. 14, 2000), cert. pending, No. 00–777 (releasing a Cambodian convicted of rape and robbery); *Phuong Phuc Le* v. *INS*, No. 00–16095 (CA9, Sept. 18, 2000), cert. pending, No. 00–1001 (releasing a Vietnamese citizen convicted of voluntary manslaughter in a crime involving the attempted murder of two other persons). Today's result will ensure these dangerous individuals, and hundreds more like them, will remain free while the Executive Branch tries to secure their removal. By contrast, aliens who violate mere tourist visa requirements, *ante*, at 691, can in the typical case be held pending deportation on grounds that a minor offender is more likely to be removed. There is no reason to suppose Congress intended this odd result.

The majority's rule is not limited to aliens once lawfully admitted. Today's result may well mandate the release of those aliens who first gained entry illegally or by fraud, and, indeed, is broad enough to require even that inadmissible and excludable aliens detained at the border be set free in our community. In *Rosales-Garcia* v. *Holland*, 238 F. 3d 704, 725 (CA6 2001), for example, Rosales, a Cuban citizen, arrived in this country during the 1980 Mariel boatlift. *Id.*, at 707. Upon arrival in the United States, Rosales was released into the custody of a relative under the Attorney General's authority to parole illegal aliens, see 8 U. S. C. § 1182(d)(5)(A), and there he committed multiple crimes for which he was convicted and imprisoned. 238 F. 3d, at 707–708. While serving a sentence for burglary and grand larceny, Rosales escaped from prison, another of the offenses

for which he ultimately served time. *Id.*, at 708. The INS eventually revoked Rosales' immigration parole, ordered him deported, and held him pending deportation, subject to periodic consideration for parole under the Cuban Review Plan. See 8 CFR § 212.12(g)(2) (2001). In reasoning remarkably similar to the majority's, the Court of Appeals for the Sixth Circuit held that the indefinite detention of Rosales violated Fifth Amendment due process rights, because "the government has offered . . . no credible proof that there is any possibility that Cuba may accept Rosales's return anytime in the foreseeable future." 238 F. 3d, at 725. This result—that Mariel Cubans and other illegal, inadmissible aliens will be released notwithstanding their criminal history and obvious flight risk—would seem a necessary consequence of the majority's construction of the statute.

The majority's confidence that the Judiciary will handle these matters "with appropriate sensitivity," *ante*, at 696, 700, allows no meaningful category to confine or explain its own sweeping rule, provides no justification for wresting this sovereign power away from the political branches in the first place, and has no support in judicially manageable standards for deciding the foreseeability of removal.

It is curious that the majority would approve of continued detention beyond the 90-day period, or, for that matter, during the 90-day period, where deportation is not reasonably foreseeable. If the INS cannot detain an alien because he is dangerous, it would seem irrelevant to the Constitution or to the majority's presumption that the INS has detained the alien for only a little while. The reason detention is permitted at all is that a removable alien does not have the same liberty interest as a citizen does. The Court cannot bring itself to acknowledge this established proposition. Likewise, it is far from evident under the majority's theory why the INS can condition and supervise the release of aliens who are not removable in the reasonably foreseeable future, or why "the alien may no doubt be returned to custody upon

a violation of those conditions." *Ante*, at 700. It is true that threat of revocation of supervised release is necessary to make the supervised release itself effective, a fact even counsel for Zadvydas acknowledged. Brief for Petitioner in No. 99–7791, at 20–21. If that is so, however, the whole foundation for the Court's position collapses.

The Court today assumes a role in foreign relations which is unprecedented, unfortunate, and unwise. Its misstep results in part from a misunderstanding of the liberty interests these aliens retain, an issue next to be discussed.

## II

The aliens' claims are substantial; their plight is real. They face continued detention, perhaps for life, unless it is shown they no longer present a flight risk or a danger to the community. In a later case the specific circumstances of a detention may present a substantial constitutional question. That is not a reason, however, for framing a rule which ignores the law governing alien status.

As persons within our jurisdiction, the aliens are entitled to the protection of the Due Process Clause. Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention. The liberty rights of the aliens before us here are subject to limitations and conditions not applicable to citizens, however. See, *e. g.*, *Mathews* v. *Diaz*, 426 U. S. 67, 79–80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens"). No party to this proceeding contests the initial premise that the aliens have been determined to be removable after a fair hearing under lawful and proper procedures. Section 1229a sets forth the proceedings required for deciding the inadmissibility or removability of an alien, including a hearing before an immigration judge, at which the INS carries "the burden of establishing by clear and convincing evidence that . . . the alien is deportable." 8

U. S. C. § 1229a(c)(3)(A); see also *Berenyi* v. *District Director, INS*, 385 U. S. 630, 636 (1967) ("When the Government seeks to . . . deport a resident alien and send him from our shores, it carries the heavy burden of proving its case by clear, unequivocal, and convincing evidence" (internal quotation marks and footnotes omitted)). Aliens ordered removed pursuant to these procedures are given notice of their right to appeal the decision, 8 U. S. C. § 1229a(c)(4), may move the immigration judge to reconsider, § 1229a(c)(5), can seek discretionary cancellation of removal, § 1229b, and can obtain habeas review of the Attorney General's decision not to consider waiver of deportation. See *INS* v. *St. Cyr, ante,* at 314. As a result, aliens like Zadvydas and Ma do not arrive at their removable status without thorough, substantial procedural safeguards.

The majority likely is correct to say that the distinction between an alien who entered the United States, as these aliens did, and one who has not, "runs throughout immigration law." *Ante,* at 693. The distinction is not so clear as it might seem, however, and I doubt it will suffice to confine the rationale adopted by the majority. The case which often comes to mind when one tests the distinction is *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206 (1953), where the Court considered the situation of an alien denied entry and detained on Ellis Island. The detention had no foreseeable end, for though Mezei was inadmissible to the United States it seemed no other country would have him. *Id.,* at 209. The case presented a line-drawing problem, asking whether the alien was in our country; or whether his situation was the same as if he were still on foreign shores; or whether he fell in a legal category somewhere in between, though if this were true, it still would not be clear how to resolve the case. The Court held the alien had no right to a hearing to secure his release. *Id.,* at 212–213. (Approximately 17 months after this Court denied Mezei relief, the Attorney General released him on parole. It appears Mezei

never returned to INS custody, though he was not admitted to the United States as a citizen or lawful permanent resident. See Weisselberg, The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei, 143 U. Pa. L. Rev. 933, 979–984 (1995).)

Here the majority says the earlier presence of these aliens in the United States distinguishes the cases from *Mezei.* For reasons given here it is submitted the majority is incorrect in its major conclusions in all events, so even if it were assumed these aliens are in a class with more rights than *Mezei,* it makes no difference. For purposes of this dissent it is not necessary to rely upon *Mezei.*

That said, it must be made clear these aliens are in a position far different from aliens with a lawful right to remain here. They are removable, and their rights must be defined in accordance with that status. The due process analysis must begin with a "careful description of the asserted right." *Reno* v. *Flores,* 507 U. S. 292, 302 (1993). We have "long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon* v. *Plasencia,* 459 U. S. 21, 32 (1982). The same is true for those aliens like Zadvydas and Ma, who face a final order of removal. When an alien is removable, he or she has no right under the basic immigration laws to remain in this country. The removal orders reflect the determination that the aliens' ties to this community are insufficient to justify their continued presence in the United States. An alien's admission to this country is conditioned upon compliance with our laws, and removal is the consequence of a breach of that understanding.

It is true the Court has accorded more procedural protections to those aliens admitted to the country than those stopped at the border, observing that "a continuously present alien is entitled to a fair hearing when threatened with

deportation." *Ibid.; Mezei, supra,* at 212 ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. ... But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned'" (quoting *United States ex rel. Knauff* v. *Shaughnessy,* 338 U. S. 537, 544 (1950))). Removable and excludable aliens are situated differently before an order of removal is entered; the removable alien, by virtue of his continued presence here, possesses an interest in remaining, while the excludable alien seeks only the privilege of entry.

Still, both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious. Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish. See *Wong Wing* v. *United States,* 163 U. S. 228 (1896). This accords with international views on detention of refugees and asylum seekers. See Report of the United Nations Working Group on Arbitrary Detention, U. N. Doc. E/CN.4/2000/4 (Dec. 28, 1999); United Nations High Commissioner for Refugees, Guidelines on Applicable Criteria and Standards Relating to the Detention on Asylum-Seekers (Feb. 10, 1999). It is neither arbitrary nor capricious to detain the aliens when necessary to avoid the risk of flight or danger to the community.

Whether a due process right is denied when removable aliens who are flight risks or dangers to the community are detained turns, then, not on the substantive right to be free, but on whether there are adequate procedures to review their cases, allowing persons once subject to detention to show that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large. The proce-

dures to determine and to review the status-required detention go far toward this objective.

By regulations, promulgated after notice and comment, the Attorney General has given structure to the discretion delegated by the INA in order to ensure fairness and regularity in INS detention decisions. First, the INS provides for an initial postcustody review, before the expiration of the 90-day removal period, at which a district director conducts a record review. 8 CFR § 241.4 (2001). The alien is entitled to present any relevant information in support of release, and the district director has the discretion to interview the alien for a personal evaluation. § 241.4(h)(1). At the end of the 90-day period, the alien, if held in custody, is transferred to a postorder detention unit at INS headquarters, which in the ordinary course will conduct an initial custody review within three months of the transfer. § 241.4(k)(2)(ii). If the INS determines the alien should remain in detention, a two-member panel of INS officers interviews the alien and makes a recommendation to INS headquarters. §§ 241.4(i)(1)–(3). The regulations provide an extensive, nonexhaustive list of factors that should be considered in the recommendation to release or further detain. Those include: "[t]he nature and number of disciplinary infractions"; "the detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history"; "psychiatric and psychological reports pertaining to the detainee's mental health"; "[e]vidence of rehabilitation"; "[f]avorable factors, including ties to the United States such as the number of close relatives"; "[p]rior immigration violations and history"; "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal, including history of escapes"; and any other probative information. § 241.4(f). Another review must occur within one year, with mandatory evaluations each year thereafter; if the alien re-

quests, the INS has the discretion to grant more frequent reviews. §241.4(k)(2)(iii). The INS must provide the alien 30-days advance, written notice of custody reviews; and it must afford the alien an opportunity to submit any relevant materials for consideration. §241.4(i)(3)(ii). The alien may be assisted by a representative of his choice during the review, §§241.4(i)(3)(i), (ii), and the INS must provide the alien with a copy of its decision, including a brief statement of the reasons for any continued detention, §241.4(d).

In this context the proper analysis can be informed by our cases involving parole-eligibility or parole-revocation determinations. In *Morrissey* v. *Brewer*, 408 U. S. 471 (1972), for example, we held some amount of process was due an individual whose parole was revoked, for "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty." *Id.*, at 482; see also *Board of Pardons* v. *Allen*, 482 U. S. 369 (1987). We rejected in *Morrissey* the suggestion that the State could justify parole revocation "without some informal procedural guarantees," 408 U. S., at 483, but "[g]iven the previous conviction and the proper imposition of conditions," we recognized that "the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial," *ibid.* We held the review process need not include a judicial officer or formal court proceeding, but could be conducted by a neutral administrative official. *Id.*, at 486.

While the majority expresses some concern that the regulations place the burden on the alien to show he is no longer dangerous, that question could be adjudicated in a later case raising the issue. It should be noted the procedural protection here is real, not illusory; and the criteria for obtaining release are far from insurmountable. Statistics show that between February 1999 and mid-November 2000 some 6,200 aliens were provided custody reviews before expiration of the 90-day removal period, and of those aliens about 3,380

were released. 65 Fed. Reg. 80285 (2000); Reply Brief for Petitioners in No. 00–38, p. 15. As a result, although the alien carries the burden to prove detention is no longer justified, there is no showing this is an unreasonable burden.

Like the parolee in *Morrissey*, who was aware of the conditions of his release, the aliens in the instant cases have notice, constructive or actual, that the INA imposes as a consequence of the commission of certain crimes not only deportation but also the possibility of continued detention in cases where deportation is not immediately feasible. And like the prisoner in *Board of Pardons* v. *Allen*, who sought federal-court review of the discretionary decision denying him parole eligibility, removable aliens held pending deportation have a due process liberty right to have the INS conduct the review procedures in place. See 482 U. S., at 381. Were the INS, in an arbitrary or categorical manner, to deny an alien access to the administrative processes in place to review continued detention, habeas jurisdiction would lie to redress the due process violation caused by the denial of the mandated procedures under 8 CFR § 241.4 (2001).

This is not the posture of the instant cases, however. Neither Zadvydas nor Ma argues that the Attorney General has applied the procedures in an improper manner; they challenge only the Attorney General's authority to detain at all where removal is no longer foreseeable. The Government has conceded that habeas jurisdiction is available under 28 U. S. C. § 2241 to review an alien's challenge to detention following entry of a final order of deportation, Brief for Respondents in No. 99–7791, at 9–10, n. 7; Tr. of Oral Arg. 59, although it does not detail what the nature of the habeas review would be. As a result, we need not decide today whether, and to what extent, a habeas court could review the Attorney General's determination that a detained alien continues to be dangerous or a flight risk. Given the undeniable deprivation of liberty caused by the detention, there might be substantial questions concerning the severity nec-

essary for there to be a community risk; the adequacy of judicial review in specific cases where it is alleged there is no justification for concluding an alien is dangerous or a flight risk; and other issues. These matters are not presented to us here.

In all events, if judicial review is to be available, the inquiry required by the majority focuses on the wrong factors. Concepts of flight risk or future dangerousness are manageable legal categories. See, e. g., *Kansas* v. *Hendricks*, 521 U. S. 346 (1997); *Foucha* v. *Louisiana*, 504 U. S. 71 (1992). The majority instead would have the Judiciary review the status of repatriation negotiations, which, one would have thought, are the paradigmatic examples of nonjusticiable inquiry. See *INS* v. *Aguirre-Aguirre*, 526 U. S., at 425. The inquiry would require the Executive Branch to surrender its primacy in foreign affairs and submit reports to the courts respecting its ongoing negotiations in the international sphere. High officials of the Department of State could be called on to testify as to the status of these negotiations. The Court finds this to be a more manageable, more appropriate role for the Judiciary than to review a single, discrete case deciding whether there were fair procedures and adequate judicial safeguards to determine whether an alien is dangerous to the community so that long-term detention is justified. The Court's rule is a serious misconception of the proper judicial function, and it is not what Congress enacted.

For these reasons, the Court should reverse the judgment of the Court of Appeals for the Ninth Circuit and affirm the judgment of the Court of Appeals for the Fifth Circuit. I dissent.