**Sameh Radamis FAHIM, Petitioner,**

v.

**John ASHCROFT, et al., Respondents.**

**No. CIV.A. 102CV338JEC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2002.

Layli Eskandari, Charles H. Kuck, Atlanta, GA, for Plaintiff.

Melanie D. Wilson, Office of U.S. Atty., Atlanta, GA, for Defendant.

## ORDER

CARNES, District Judge.

Petitioner, Sameh Radamis Fahim, an Egyptian national presently confined at the Columbia Care Center in Columbia, South Carolina, has filed a habeas corpus petition, pursuant to 28 U.S.C. § 2241, in which he challenges his ongoing detention by the Immigration and Naturalization Service ("INS").[1] Petitioner contends that he has been detained for an unreasonable period of time, pursuant to *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), and he demands his immediate release from custody.

### Factual Summary

Petitioner is a native and citizen of Egypt who first arrived in the United States in 1990 on a student visa. (Resps.' Mot. To Dismiss [4] at Exh. 1.) At some point, he left school,[2] apparently because

---

1. Respondent will be referred to as "the Government" or "the INS."

2. According to one of the INS documents in the file, petitioner first attended L.B. Wallace

he was suffering from a serious mental illness. (Pet.'s Mem. [5] at 1.) Instead of returning home to Egypt, as he should have done since he was no longer in school, petitioner stayed in this country, and he has now, in violation of the law, overstayed his visa for several years.

Petitioner has been committed to a mental hospital at least two times[3] for psychiatric care and, on one occasion, he escaped from the custody of such a facility. In 1995, Petitioner was committed to an Alabama psychiatric institution under court order for three months. (Resps.' Mot. [4] at Exh. 1.) In March 1999, Petitioner was again committed to a psychiatric institution in Alabama, but escaped and was ultimately arrested and convicted of theft of services in Texas. (*Id.*) Petitioner was returned to the psychiatric facility from which he escaped. (*Id.*)

Petitioner apparently attracted the attention of INS officials as a result of an investigation by the United States Secret Service. Specifically, the Secret Service had been investigating petitioner because of threatening letters that he had been sending to Chelsea Clinton. (*Id.* at Exh. 1–H.) Initially, these letters were romantic in nature, but they later began to have a hostile tone. Petitioner also expressed hostility toward Ms. Clinton in a letter to a third party. As a result, the Secret Service interviewed petitioner who expressed anger toward then Vice–President Gore and toward former President Bush, whom petitioner blamed for his hospitalization; petitioner also revealed "great hostility" toward his mother. (*Id.*)

In July 1999, INS officials detained Petitioner, serving a Notice to Appear that charged Petitioner with being removable because he had failed to comply with the conditions of his nonimmigrant status. (*Id.*) On March 22, 2000, an Immigration Judge ordered Petitioner removed from the United States. (Resps.' Mot. [4] at Exh. 1–D.) On February 27, 2001, the Board of Immigration Appeals ("BIA") dismissed Petitioner's appeal. (*Id.* at Exh. 1–E.)

On March 27, 2001, petitioner filed a Petition for Review of the Order of Removal with the Eleventh Circuit. The Eleventh Circuit dismissed the case on January 9, 2002. (Pet. For Writ of Habeas Corpus (hereinafter Pet.)[1] at ¶ 9.) One month later, on February 6, 2002, petitioner filed the instant petition.

### The Parties' Contentions

In his petition for a writ of habeas corpus, Petitioner states that:

The INS has detained the Petitioner since February 2001. By detaining him for over ninety days without removing him or releasing him, the INS has violated the rule set by [t]he Supreme Court in *Zadvydas* .... Petitioner remains detained by the INS without hope that he will either be deported to Egypt or be released from INS custody to be under the care of doctors and his family. This restraint on Petitioner's liberty is in violation of the Constitution and laws and treaties of the United States because this detention is without a rational

---

Community College in Alabama, then Auburn University in Montgomery, and then Troy State University, likewise in Montgomery. He was committed to a psychiatric institution as early as 1995 and has apparently earned no degree during the five previous years that he had been in this country. (Resps.' Mot. [4] at Exh. 1–A.)

3. One of the INS documents indicates that petitioner has been committed "several...thimes (sic)" to a psychiatric institution, (Resps.' Mot. [4] at Exh. 1–A) but the Court has only been able to find a confirmation of two such commitments in the file.

basis and is meant to punish Petitioner rather than to secure his deportation should that ever be required.

(Pet. [1] at ¶ 19.) In short, petitioner's claim is based on the *Zadvydas* decision and he argues that his continued detention pending deportation exceeds what that decision indicates to be a reasonable period of detention, as required by pertinent immigration statutes.

In its Motion to Dismiss, filed on February 11, 2002, the INS states that it "has diligently pursued Petitioner's removal and maintains the expectation that Petitioner can and will be returned to his native country of Egypt." (Resps.' Mot. [4] at 5.) The INS, on July 19, 2001, sent an emergency travel document request to the Egyptian Embassy. (Resps.' Mot. [4] at Exh. 1–F.) Second, only three months before petitioner had filed the present petition, on November 8, 2001, the INS had flown petitioner to the Egyptian Embassy in Washington, D.C. for an interview to try to move along the process of getting the travel documents issued. (*Id.* at 9.)

The INS also asserts that Petitioner has a valid passport that would facilitate his return to Egypt, but that he has so far refused to produce it. (*Id.* at 5 and Exh. 1.) The INS investigation has indicated that petitioner was issued an Egyptian passport in 1990 and that he renewed this passport in 1997 at the Egyptian Consulate in Houston, Texas. Indeed, petitioner indicated on the date of his arrest, July–14, 1999, that he had a valid passport in a safe deposit box at a specified bank in Montgomery, Alabama. (*Id.* at Exh. 1.) Since that time, petitioner has stated that his passport was sent to his uncle in Cairo, Egypt and has further indicated that he will not assist the INS in retrieving this passport. (*Id.* at Exh. 1–F.)

According to a report authored by an INS official on January 8, 2002, this official recommends against releasing petitioner on bond. (*Id.* at Exh. 1–H.) In addition to reiterating the troubling communications concerning the Clintons, Gore, and former President Bush, the official indicated that, although petitioner would probably do well if he were on medication, he always refuses to take his medicine once released from a mental hospital. Further, although petitioner has family in this country, the official indicates that they have been unable to control his behavior in the past and that they show no reason to believe that they could do so in the future. Accordingly, based on petitioner's history of absconding from mental health programs and his potential danger to the community, the official recommended against release on bond, pending petitioner's deportation to Egypt. (*Id.*)

## Discussion

### I. *Zadvydas* Decision

In *Zadvydas,* the Supreme Court held that the post-removal detention statute, 8 U.S.C. § 1231(a)(6) (1994 ed. Supp. V), limits an alien's post-removal detention to a period reasonably necessary to bring about that alien's removal from the United States and does not permit indefinite detention. 533 U.S. at 689, 121 S.Ct. 2491. If the removal of an alien subject to a final order of removal is not reasonably foreseeable, a habeas court should find the continued detention to be unreasonable and therefore no longer authorized by statute. *Id.* at 699–700, 121 S.Ct. 2491. The Court recognized six months as a presumptively reasonable period of post-removal order detention. *Id.* at 700–01, 121 S.Ct. 2491. "After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701,

121 S.Ct. 2491. In what amounts to a sliding scale test, the Court further noted that "for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* The Court emphasized that the six month presumption does not mean that every alien not removed must be released · after six months. *Id.* "To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

In order to be granted relief from post-removal order detention pursuant to *Zadvydas,* an alien must make a two-part showing. He must first show that he has been detained beyond the six month period that the Supreme Court declared to be a presumptively reasonable time to detain a removable alien awaiting deportation. *See Akinwale v. Ashcroft,* 287 F.3d 1050, 1051 (11th Cir.2002). Second, he must provide good reason to believe that there is no likelihood of removal in the reasonably foreseeable future. *Id.* at 1052.

## II. Had Petitioner Been Detained Beyond A Six Month Period When he Filed His Petition?

A six-month custodial period of time following the order of removal must have elapsed prior to the filing of a habeas petition challenging confinement under *Zadvydas. Akinwale v. Ashcroft,* 287 F.3d 1050, 1052 and n. 3 (11th Cir.2002). At a first glance it would appear that petitioner Fahim had been in INS custody for over six months prior to the filing of this petition and that he therefore would have met the first half of the required two-part showing. If so, he would have satisfactorily alleged that his detention is no longer *presumptively* reasonable, which would

then allow him to proceed to the second part of the test: specifically, to prove that there is good reason to believe that there is no likelihood of removal in the reasonably foreseeable future.

Yet, this Court is not persuaded that petitioner has actually made even the first showing. To recite again the pertinent dates: on February 27, 2001, the Board of Immigration Appeals ("BIA") dismissed Petitioner's appeal, which petitioner construes as the date that his removal order became final. Petitioner filed the present petition on February 6, 2002, which is almost a year after the order of removal became final. Typically, one would count six months from the date of this final order of removal to reach the date on which detention would no longer be presumptively reasonable. *Akinwale v. Ashcroft,* 287 F.3d 1050, 1052 n. 3 (11th Cir.2002). With such a calculation, petitioner contends that he was in custody for one year prior to filing his petition.

Yet, in *Akinwale,* the Eleventh Circuit also noted that this six month period is tolled if the alien acts to prevent his removal. *Id.* at 1052 n. 3. In support of this proposition, the Court cited 8 U.S.C. § 1231(a)(1)(C)(1999), which provides that the "removal period shall be extended...if the alien...acts to prevent the alien's removal subject to an order of removal." *Id.* Specifically, in *Akinwale,* the alien's period of removal began on November 17, 1999 and he filed his petition on March 21, 2000, which was only four months later. Accordingly, the Eleventh Circuit held that Akinwale had not been held for the necessary period of time to state a claim. *Id.* at 1051–52. The Court also noted, however, that Akinwale had not even had one "unencumbered" month in custody, as he had moved for a stay of deportation less than a month after being taken into custody, which stay was granted almost two months

**1364**

after the November start date. *Id.* at 1052 n. 3.

■ In the present case, the order of removal became final on February 26, 2001. Yet, petitioner Fahim filed a Petition for Review of the Order of Removal with the Eleventh Circuit on March 27, 2001. That is, like *Akinwale*, petitioner "chose to simultaneously challenge issues related to his removal order and his post-removal period detention." *Akinwale*, 287 F.3d at 1052 n. 3. The Eleventh Circuit thereafter dismissed the case on January 9, 2002. As noted, petitioner filed the present petition on February 6, 2002. Accordingly, under the authority of *Akinwale*, this Court concludes that only a one month period of detention had elapsed— from January 9, 2002–February 6, 2002— when petitioner filed the current petition and hence he has not met the time period, set out by that case or by *Zadvydas*, that is necessary to trigger review of his detention.[4]

Petitioner here might well argue that even though his six-month period of detention had not run when he first filed his habeas petition with this court in February, 2002, it has certainly run by the present time, almost eight months later. Again, however, *Akinwale* held that the six-month period of time must have expired at the time the § 2241 petition is filed in order to state a *Zadvydas* claim. 287 F.3d at 1052. Indeed, in *Akinwale*,

the habeas petition was filed on March 21, 2000 and the Eleventh Circuit issued its ruling denying that petition on April 4, 2002: over two years later. Clearly, had the court been looking only at the passage of time, a six month period from the date of the removal order had long expired by the time the panel issued its ruling. Yet, because the habeas petition was filed prematurely, the panel held that this was one ground for denying the petition.

This holding is more than a technical ruling, but has a sensible practical component, as well. That is, there are millions of illegal aliens in the United States. Assuming that the INS is accomplishing even a small part of its statutory mission to guard this country's borders against the intrusion of those who would illegally enter or remain on its shores, one can assume that, on any given day, there must be thousands of such illegal aliens in detention awaiting removal. The statute that the Supreme Court was interpreting in *Zadvydas* allowed a six-month period of detention, following a final order of removal, before any unreasonableness could be assumed. A strict construction of that time limit serves a gatekeeping function to ensure that federal courts are not unnecessarily weighed down with hasty complaints by impatient illegal aliens who seek premature release back into American communities. Further, as *Akinwale* has held, an alien who is attempting to avoid depor-

---

4. It is true that Akinwale had sought and received a stay of deportation. It is not clear whether petitioner, here, sought or received a stay from the Circuit when he filed his petition for review with the latter court in March, 2001. Yet, the Court does not read *Akinwale* as holding that it was the actual granting of a stay that prompted the court to conclude that the running of the period of detention had been tolled. Indeed, the statute cited by the panel provides for an extension of the removal period whenever the alien "acts" to prevent his removal, not just when he succeeds. 8

U.S.C. § 1231(a)(1)(C). Moreover, the *Akinwale* panel concluded that less than one month of detention had occurred with regard to the petitioner before them: a calculation that necessarily means that the court was tolling the detention period based on the filing of Akinwale's motion, not the date on which it was granted. Finally, as a practical matter, whether or not stays are actually granted, the Court expects that the INS may often defer deportation where the validity of a deportation decision is before a federal court.

tation should not properly be able to count the time spent litigating that attempt as part of the detention period spent waiting for actual physical removal to his native country.

Therefore, the Court concludes that petitioner has failed to satisfy the first prong of *Zadvydas*. Even had he done so, however, the Court also concludes that he has likewise failed to satisfy the second prong of *Zadvydas*.

### III. Petitioner Has Not Alleged A Significant Likelihood That His Removal is Unlikely in the Foreseeable Future

"While an alien's detention will no longer be presumed to be reasonable after six months, there is nothing in *Zadvydas* which suggests that the Court must or even should assume that any detention exceeding that length of time is unreasonable." *Lema v. INS*, 214 F.Supp.2d 1116, 1118 (W.D.Wash.2002). An alien may be held in confinement past the six month period if he fails to show that there is no significant likelihood of removal in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491.

The Court concludes here that petitioner has not alleged sufficient evidence to establish that there is no significant likelihood of his removal in the reasonably foreseeable future. Petitioner relies on the bare fact that the Egyptian consulate has not yet issued any travel documents for

him despite the efforts of the INS to secure them. (Pet. [1] at ¶ 14.) He also states that his family has checked with the Egyptian Consulate "on several occasions" regarding the issuance of the documents, but with no success. (*Id.*) He therefore alleges that it is unknown whether the Egyptian government will ever issue the requested travel documents. (Pet.'s Resp. [9] at 2.)

■ Petitioner's bare allegations are insufficient to demonstrate a significant unlikelihood of his removal in the reasonably foreseeable future. First, petitioner has alleged no institutional barriers to the repatriation of aliens to Egypt. *See Khan v. Fasano*, 194 F.Supp.2d 1134, 1137 (S.D.Cal.2001). Egypt is a deportable country. (Resps.' Mot. [4] at Exh. 1–H.) Indeed, a recent case out of the Eleventh Circuit indicates that Egypt accepts back its citizens who are deported from this country. In *Soliman v. United States*, 296 F.3d 1237 (11th Cir.2002), *aff'g In re Soliman*, 134 F.Supp.2d 1238 (N.D.Ala.2001), the Eleventh Circuit dealt with a claim concerning the conditions of the confinement of an Egyptian national who had been deported, pursuant to an order of removal, after the filing of his appeal but before a decision by the appellate court. The panel concluded that the claims were moot. Of interest to this litigation, however, is the fact that although it took over three years to work out an arrangement whereby Egypt would accept the alien,[5] he was eventually deported there. Here, for

---

**5.** The United States Government had earlier been solicitous of Soliman's welfare and had held off deporting him to Egypt because it feared that the latter might torture Soliman, who had a frightening record of affiliation with terrorists, including a group that was responsible for the murder of Anwar Sadat and a group whose goal is the murder of President Mubarak.

When Soliman tried to play the *Zadvydas* card, however, by demanding his immediate

release from custody because he had been detained so long, the INS apparently decided that, if Soliman truly wanted out of American custody, the Government would grant him his wish. Accordingly, upon receiving assurances from the Egyptian Government that Soliman would not be tortured, he was removed to his native land, five days later. *Id.* at 1241.

purposes of repatriation, petitioner would not appear to present anywhere near the unsavory background of Soliman. Accordingly, his suggestion that he will never be accepted by Egypt appears to be pure speculation.

Indeed, this situation is in marked contrast to that of Kim Ho Ma, one of the aliens whose case was considered in *Zadvydas*. Ma was from Cambodia, a country with which the United States has no repatriation agreement. As a result, there was virtually no hope of repatriating Ma back to his native land. *Zadvydas*, 533 U.S. at 686, 121 S.Ct. 2491. Similar facts do not exist in this case. Likewise, the facts concerning the other alien whose detention the Supreme Court considered are also very different from this case. That second alien, Kestutis Zadvydas, was born in a refugee camp in Germany in 1948. Zadvydas was literally a man without a country, as he was a citizen of no country and therefore was an individual whom no other nation would ever accept, no matter the efforts of the INS. *Zadvydas*, 533 U.S. at 684, 121 S.Ct. 2491. Petitioner has shown nothing in the circumstances of his status that remotely resembles the situations of Ma and Zadvydas.

Petitioner has likewise made no showing that there are particular individual barriers to his repatriation to Egypt. *See Khan*, 194 F.Supp.2d at 1137. The lack of visible progress since the INS requested travel documents from the Egyptian government does not in and of itself meet his burden of showing that there is no significant likelihood of removal. "[I]t simply shows that the bureaucratic gears of the INS are slowly grinding away." *Id.* In other words, the mere fact that the Egyptian government has taken its time in responding to the INS request for travel documents does not mean that it will not do so in the future. In short, petitioner

has not alleged facts indicating that Egypt will never issue him papers nor has he alleged any reasons why Egypt, which is purportedly our ally and which presumably is a recipient of American foreign aid, would not ultimately comply with a request from the United States Government in this particular instance.

Moreover, as alleged by the Government, petitioner has a valid Egyptian passport that he has refused to turn over to the Government. The latter indicates that its access to that passport could facilitate petitioner's removal. Petitioner has not, in his pleadings, disputed either of those allegations. Thus, at a bare minimum, it appears that petitioner is not only *not trying* to get back to Egypt promptly, but that he is, in fact, trying to thwart his removal. To the extent that the petitioner may hold, in part, the keys to his jail cell, he cannot complain, when he hides those keys, about his continued detention.

The Court concludes that petitioner, in effect, seeks to place the burden on the Government to show when it will remove petitioner, whereas the Supreme Court held that it is petitioner's burden first to show good reason to believe that there is no significant likelihood of removal. All petitioner has shown is the passage of some time. Unlike Ma and Zadvydas, for whom deportation seemed impossible no matter how long they waited, for this petitioner, there is no reason to believe that he will not ultimately be returned to Egypt. Further, it must be noted that the underpinning of the Supreme Court's decision was a pronouncement that detention pending removal was unreasonable under the statute, when that detention served nothing but a punitive function. *Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491. Accordingly, when an alien had no prospects of removal to another country, either because he had no country (Zadvydas) or his country had

no treaty with the United States (Ma), then the Supreme Court concluded that detention, under such circumstances, was necessarily punitive in nature.

The Supreme Court did not discuss the more typical deportation cases, in which the alien will ultimately be removed, although the time to accomplish that task may not be brief. Because of that Court's silence on the practical ramifications of its holding on the thousands of real cases that do not involve the extreme facts of *Zadvydas*, it is up to federal district and appellate courts to fill in the blanks left open in the high Court's very generalized pronouncement. In putting some meat on the bones of the Supreme Court's holding, these "inferior" courts must also arrive at· standards of reasonableness that not only make sense, but that also can be made workable for the busy courts that will employ them.

In that vein, this Court concludes that the reasonableness of detentions pending deportation cannot be divorced from the reality of the bureaucratic delays that almost always attend such removals. While the American government can be faulted if its bureaucracy causes delay, it cannot be held responsible for the inefficiencies, or worse, of the bureaucracies of other countries. Clearly, it is no secret that the bureaucracies of second and third world countries, and not a few first world countries, can be inexplicably slow and counterintuitive in the methods they employ as they lumber along in their decision-making. To conclude that a deportable alien who hails from such a country must be released from detention, with the likely consequence of flight from American au-

thorities back into the hinterlands, simply because his native country is moving slow, would mean that the United States would have effectively ceded its immigration policy to those other countries. The Court does not read the holding in *Zadvydas* as requiring such an extreme result.

Moreover, any calculus of reasonableness must respond to the possibility that the *Zadvydas* ruling, itself, may well have changed the immigration landscape by influencing the speed with which some countries issue removal documents for their deportable citizens. Thus, countries that previously might have felt some pressure to accept back citizens who were ·awaiting deportation in American jails may now see no downside to acquiescing in their nationals' efforts to stay in the United States— simply by delaying forever the necessary paperwork—as long as those nationals are suffering no ill effects, such as detention, from the delay. Moreover, less benign motivations can also be at play. Nations that openly or tacitly support those who would harm the citizens of this country can simply dawdle in filling out the needed paperwork if they perceive that such conduct will accomplish the intended result of leaving, at large in this country, aliens who might seek to do harm to Americans. Again, this Court does not read the *Zadvydas* holding as intending such a dangerous result.[6]

Accordingly, this Court does not conclude that mere delay triggers an inference that a deportable alien will never be accepted by his native country. This Court further concludes that, by placing the burden of proof on the petitioner, initially, to make a showing of the unlikeli-

---

6. Of course, this Court may have misinterpreted *Zadvydas* and the Supreme Court may well have envisioned and intended the above consequences. If so, the Court hopes that this Order, or one like it, will make its way up through the appellate route, back to the high Court, so that the latter can give some clarity to a very troubling and confusing area for district courts.

**1368**

hood of deportation, the Supreme Court created a mechanism whereby the mere fact of some delay will not require the release of the alien. The Supreme Court's requirement that the petitioning alien must, at the outset, make a showing of the unlikelihood of deportation also avoids what could have been a crippling effect by *Zadvydas* on the busy dockets of federal district courts, whose resources are already strained. Essentially, petitioner contends that whenever a deportable alien has been awaiting deportation for six months, a district court must step in, hold a hearing, learn all about treaties with other countries and immigration practices, review all communications between embassy personnel, and then, like a super-INS Director, micromanage every aspect of the deportation effort. Given the thousands of illegal aliens awaiting deportation, such a protocol could have a devastating effect on the abilities of such courts to do their other work.

■ For the above reasons, the Court concludes that petitioner has made insufficient allegations to warrant a hearing. There has been no proffer of what evidence petitioner would offer at such a hearing. Accordingly, there has been no showing that such a hearing would provide the Court with any enlightenment on the ultimate question at issue here. "A habeas corpus petitioner is entitled to an evidentiary hearing on his or her claims if he or she alleges facts that, if proved at the hearing, would entitle petitioner to relief." *Baldwin v. Johnson*, 152 F.3d 1304, 1312 (11th Cir.1998) (quoting *Meeks v. Singletary*, 963 F.2d 316, 319 (11th Cir.1992), *cert. denied*, 507 U.S. 950, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993)). No such facts have been alleged and therefore this Court denies petitioner's request for a hearing, as well as the petition, itself.

Accordingly, Petitioner's petition for a writ of habeas corpus [1] is **DENIED, WITHOUT PREJUDICE** to the right to file a new petition if circumstances change. *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir.2002).

### Conclusion

For the above reasons, the petition [1] and petitioner's motion for a hearing [2] and for oral argument [6] are hereby **DENIED.** The Government's motion to dismiss [4] is **GRANTED.** The Clerk is directed to close this action.