Waled Naim KHADER, Petitioner,

v.

Eric HOLDER, United States Attorney General, et al., Respondents.

Civil Action No. 4:11–cv–1273–KOB–PWG.

United States District Court,
N.D. Alabama,
Middle Division.

July 7, 2011.

Samuel J. Brooke, Montgomery, AL, for Petitioner.

Carolyn Williams Steverson, U.S. Attorney's Office, Birmingham, AL, for Respondents.

---

**MEMORANDUM OPINION**

KARON OWEN BOWDRE, District Judge.

This is a action on a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2241. (*See* Doc.[1] 1–1). The Petitioner, Waled Naim Khader, seeks review of the lawfulness of his continued detention by the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), pending deportation to Jordan. On June 27, 2011, the magistrate judge entered a report and recommendation stating that, under *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Petitioner is due to be released under an order of supervision pending receipt of travel documents. (Doc. 9). On July 6, 2011, respondents have filed a motion to dismiss the action as moot because Petitioner has been released under an order of supervision. (Doc. 10). Upon consideration, the court finds that the respondents' motion is due to be granted and that the petition is due to be dismissed as moot.

In support of their motion to dismiss, the respondents have filed a copy of an unsworn declaration made pursuant to 28 U.S.C. § 1746 by a Deportation Officer stating that the petitioner was released on July 1, 2011 on an order of supervision. (Doc. 10–1). Thus, his petition seeking that very relief is moot. *See Nyaga v. Ashcroft*, 323 F.3d 906, 913 (11th Cir.2003) ("a case must be dismissed as moot if the court can no longer provide 'meaningful relief' "); *see also Spencer v. Kemna*, 523 U.S. 1, 8, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (once a habeas petitioner is released from custody, he must demonstrate collateral consequences to avoid mootness doc-

---

1. References herein to "Doc. ..." are to the docket numbers assigned by the Clerk of the Court to the pleadings filed in this matter.

trine). Accordingly, this matter is due to be dismissed. *See Murphy v. Holder,* 2010 WL 1994179 (N.D.Fla. April 13, 2010); *Subrun v. Holder,* 2009 WL 3568670 (S.D.Fla. Oct. 30, 2009); *Dong v. Holder,* 2009 WL 2987418 (S.D.Ala. Sept. 9, 2009). A separate order will be entered.

## MAGISTRATE JUDGE'S REPORT & RECOMMENDATION .

PAUL W. GREENE, United States Chief Magistrate Judge.

This is a action on a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2241. (*See* Doc.[1] 1–1). The Petitioner, Waled Naim Khader, seeks review of the lawfulness of his continued detention by the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), pending deportation to Jordan. The action is before the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Rule 72, Fed.R.Civ.P. Upon consideration, it is RECOMMENDED that a writ of habeas corpus issue to the defendant directing that Waled Naim Khader be immediately released under an order of supervision.

## I. BACKGROUND

Petitioner was born in Amman, Jordan, in 1983. (Doc. 6–1 ("Petitioner's Declaration" or "Pet. Decl.") ¶ 1). His mother was born in Kuwait, while his father is Palestinian, born in the West Bank in 1953. (Id. ¶ 9(1)). Petitioner has lived in the United States since entering on or about August 19, 1990, through John F. Kennedy Airport in New York City. (Id. ¶¶ 2–3). At that time, Petitioner, then age seven, traveled under his mother's passport and on the authority of a student visa issued to his father. (Id. ¶¶ 2–3).

On July 9, 2010, Petitioner pled guilty in a Georgia state court to a charge of theft by taking, *see* Ga.Code Ann. § 16–8–2, and was sentenced to five years confinement, with 60 days to serve and 4 years and 10 months of probation. (Doc. 5–1 ("Declaration of Julianty Sutanto" or "Sutanto Decl.") ¶ 10; Doc. 6–2). After his release from Georgia state custody on August 4, 2010, Petitioner was taken into custody by ICE officials. (Id. ¶¶ 10 & 12). On August 5, 2010, Petitioner was issued a Final Administrative Removal Order under Immigration and Nationality Act ("INA") § 238, 8 U.S.C. § 1228. (Id. ¶ 13). That order provided for Petitioner's removal from the United States on the ground that he had been convicted of an "aggravated felony," INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), which includes a "theft offense ... for which the term of imprisonment [is] at least one year." INA § 1101(a)(43)(G), 8 U.S.C. § 1101(a)(43)(G). Petitioner did not appeal that order. (Pet. Decl. ¶ 5). As further described below, since the entry of the removal order, both United States immigration officials and the Petitioner have taken steps to secure required travel documents from Jordan authorizing Petitioner's removal to that country. These efforts have been unsuccessful, and Petitioner has remained in ICE custody at the Etowah County Detention Center in Etowah, Alabama. (Id. ¶ 4). Petitioner does not have a current passport or other travel document to Jordan. (Pet. Decl. ¶ 6). When he was a teenager he obtained a passport from Jordan which expired in the early 2000's. (Id.) Since being in ICE custody, Petitioner surrendered that expired passport to immigration officials. (Id.) On August 27, 2010, Petitioner's case was uploaded into the Electronic Travel Document

---

1. References herein to "Doc. ..." are to the docket numbers assigned by the Clerk of the Court to the pleadings filed in this matter.

request system, which allows ICE to request travel documents from an embassy or consulate and provides for the receipt of electronic travel documents directly from an embassy or consulate. (Sutanto Decl. ¶ 14). On September 4, 2010, Petitioner completed a Jordanian travel document application in English, as he does not read or write in Arabic. (Pet. Decl. ¶ 9(a); Sutanto Decl. ¶ 15). On September 15, 2010, ICE's Atlanta Enforcement and Removal Operations Office ("Atlanta ERO") contacted the Jordan Embassy. A Jordanian Consular Officer confirmed that Petitioner would be permitted to complete the travel document application in English. She further advised that copies of Petitioner's expired passport were sufficient and that since Petitioner has a Jordanian birth certificate, he was not required to write his parents' full names. (Sutanto Decl. ¶ 16). On September 17, 2010, Petitioner's travel document request packet was sent to the Embassy of Jordan in Washington, D.C. (Id. ¶ 17).

Atlanta ERO officials have diligently and consistently attempted to communicate with the Jordan Embassy for a status update of Petitioner's travel document request. On October 4, 2010, the Jordan Embassy advised Atlanta ERO that the Petitioner's travel document request packet had been received and had been forwarded to Amman for decision by the Jordanian government. (Sutanto Decl. ¶¶ 18, 19). All attempts to obtain further information on the status have been fruitless. On January 3, 2011, a representative of the Jordan Embassy advised Atlanta ERO simply that the Petitioner's travel document application was pending with the Jordan government in Amman. (Id. ¶ 28).

The same response was given again on January 31, March 18, March 30, April 6, and April 21, 2011.[2] (Id. ¶¶ 28, 34, 39, 42, 43). For his part, the Petitioner has also telephoned the Jordanian Embassy on multiple occasions, but he has also been told "repeatedly that the decision of whether to grant [him] a travel document will come from the Ministry of the Interior in Amman, Jordan, and that the Embassy in Washington, D.C., could not estimate when such a decision would be made." (Pet. Decl. ¶ 8; *see also id.* ¶¶ 9, 10).

In addition, Atlanta ERO enlisted the assistance of the Headquarters Travel Document Unit ("HQTDU"), a division of ICE based in Washington, D.C., that assists with obtaining travel documents by meeting directly with representatives of embassies and consulates of the countries from whom travel documents are requested. (Id. ¶¶ 20, 23, 30, 31). While HQTDU agreed to assist, its efforts to obtain further information and expedite the deportation process have been unsuccessful as well. On February 11, 2011, HQTDU advised Atlanta ERO that the Jordan Embassy had cautioned HQTDU "that the immigration process is very complicated in Amman" but that the "Embassy would do everything in its power to help speed up the process." (Id. ¶ 36). Nonetheless, on April 6, 2011, HQTDU advised Atlanta ERO that it had "not heard anything," and on April 14, 2011, it added that there had "been no forward progress" on Petitioner's case. (Id. ¶¶ 44, 46).

On April 13, 2011, Petitioner filed a *pro se* habeas petition in the United States District Court for the Middle District of Alabama. (Doc. 1–1). However, the Mid-

---

**2.** And those were the "productive" calls made to the Embassy; calls made in 2010 on November 16, December 8, 20, 21, and 29, and in 2011 on January 19 and 27, on February 11, and on March 24 and 28 each resulted in no one answering, a busy signal, or the leaving of a voicemail message that went unreturned. (Sutanto Decl. ¶¶ 22, 24, 25, 26, 27, 29, 32, 35, 40, 41).

dle District transferred the action to this court, which is in the district of confinement. (Docs. 1–4, 1–5). In this action, Petitioner argues that he is entitled to habeas relief to require his release from custody under an order of supervision. In response to an order to show cause why such relief is not due to be granted, the government has filed an opposition, with attached exhibits, moving the court to dismiss the petition. (Doc. 5). The Petitioner, having retained legal counsel, thereafter filed a reply (Doc. 6), and a motion for an expedited ruling and to set a hearing on his habeas petition. (Doc. 7).

## II. DISCUSSION

ICE officials are generally required to remove aliens within 90 days of the commencement of what is known as the "removal period." INA § 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A). It is undisputed that the "removal period" in Petitioner's case began on August 5, 2010, the date when his order of removal became administratively final. *See* INA § 241(a)(1)(B)(i), 8 U.S.C. § 1231(a)(1)(B)(i). Petitioner obviously was not removed within the 90–day statutory removal period. However, where an alien, like Petitioner, is subject to removal for a criminal conviction pursuant to INA § 237(a)(2), 8 U.S.C. § 1227(a)(2), the INA provides that such a "criminal alien" "may be detained beyond the removal period and, if released, shall be subject to terms of supervision," INA § 241(a)(6), 8 U.S.C. § 1231(a)(6), including appearing periodically before an immigration officer for identification and obedience to other "reasonable written restrictions on the alien's conduct or activities." INA § 241(a)(3), 8 U.S.C. § 1231(a)(3).

Nonetheless, in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court concluded that "indefinite detention" of an alien under INA § 241(a)(6), 8 U.S.C. § 1231(a)(6), "would raise serious constitutional concerns" under the Fifth Amendment Due Process Clause. *Id.,* 533 U.S. at 682, 121 S.Ct. 2491; *see also id.* at 690–96, 121 S.Ct. 2491. Therefore, the Court "construe[d] the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal court review," *id.* at 682, 121 S.Ct. 2491, under the general habeas statute, 28 U.S.C. § 2241. *See id.* at 687–88, 121 S.Ct. 2491. In conducting such a review, a federal habeas court

> must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions.

*Zadvydas*, 533 U.S. at 699–700, 121 S.Ct. 2491 (citation omitted). In making such assessments, habeas courts are to engage in a meaningful review of the legality of the alien's continued detention under all the circumstances of the particular case. *Id.* at 699, 121 S.Ct. 2491. However, they also "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute [the INA], and the Nation's need to 'speak with one voice' in immigration matters." *Id.* at 700, 121 S.Ct. 2491.

In order to minimize the occasions in which habeas courts will be called upon to

make the most difficult judgments, the *Zadvydas* Court established that a period of detention lasting six months or less is presumptively reasonable. *Id.* at 700–01, 121 S.Ct. 2491. That is not to say, of course, "that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701, 121 S.Ct. 2491. After the expiration of the six-month period, however, the alien is authorized to challenge his continued detention under § 2241. *See Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 & n. 3 (11th Cir.2002). In so doing, the alien bears the initial burden to provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491; *see also Akinwale*, 287 F.3d at 1052 (recognizing that "the alien ... must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."). Such does not require the alien "to show that deportation will prove 'impossible' " or "the absence of any prospect of removal-no matter how unlikely or unforeseeable." *Zadvydas*, 533 U.S. at 702, 121 S.Ct. 2491. Once the alien has made the initial requisite showing, the burden shifts to the government to "respond with evidence sufficient to rebut the alien's showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink." *Id.* at 701, 121 S.Ct. 2491.

At the time he filed his instant habeas petition, Petitioner had been in ICE custody for more than eight months after his removal order became final. Accordingly, Petitioner is authorized to challenge continued detention in a § 2241 habeas appli-

cation. *Zadvydas; Akinwale, supra.* The government does not contend otherwise.

Petitioner has the initial burden under *Zadvydas* to provide good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future. Petitioner has now been detained by ICE awaiting removal since August 5, 2010, almost eleven months since the order providing for his removal became final, well in excess of the six-month presumptively reasonable period under *Zadvydas.* It is undisputed that Petitioner himself has done nothing to obstruct or delay his deportation to Jordan. He has instead been fully cooperative in all efforts to secure travel documentation, including in the submission of a completed travel document request to the Jordanian Embassy over eight months ago. Despite repeated attempts by both various ICE departments and Petitioner himself to obtain information on the status of the travel document application, the Jordanian Embassy has provided neither any assurance that a travel document is forthcoming nor hinted at any timetable for resolution of Petitioner's case. Such circumstances may be themselves sufficient to meet a petitioner's burden. *See Butt v. Holder*, 2009 WL 1035354, *5 (S.D.Ala. March 19, 2009) (holding that the petitioner met his initial burden under *Zadvydas* where he was held in ICE custody for ten and one-half moths since his removal order with no indication from the Pakistani Embassy that a travel document would be issued); *Andreasyan v. Gonzales*, 446 F.Supp.2d 1186, 1190 (W.D.Wash.2006) (petitioner satisfied initial burden where he was detained for eight months since his order of removal became final and his travel document application was simply "still under review and pending a decision"); *Nma v. Ridge*, 286 F.Supp.2d 469, 475 (E.D.Pa. 2003) (recognizing that courts have found no significant likelihood of removal "where there was no definitive answer from the

target country after several months as to whether it would issue travel papers for a detainee."); *but see Fahim v. Ashcroft*, 227 F.Supp.2d 1359, 1366 (N.D.Ga.2002) (recognizing that "the mere fact that the Egyptian government has taken its time in responding to the INS request for travel documents does not mean that it will not do so in the future."); *Nasrallah v. Quarantillo*, 2006 WL 1540807, *4 (D.N.J. May 31, 2006) ("Federal courts disagree as to the extent to which the passage of time can suffice to meet the alien's burden." (collecting cases)).

Even assuming that the delays and refusal to provide information about Petitioner's travel document request to Jordan are alone insufficient to meet the initial burden, Petitioner's position is also buttressed by his showing that there exists in his particular case at least some doubt about whether Jordanian officials will consider him a Jordanian national under that country's laws. Although Petitioner was born in Jordan, that fact alone does not establish Jordanian nationality. *See* Jordanian Nationality Law, 1954, Article 3.[3] If Petitioner's father or mother is a Jordanian national, Petitioner would be as well. *See id.*, Art. 3(3), (4). However, given that his mother is a native of Kuwait and his father is a Palestinian born in the West Bank, it is unclear whether either is considered a Jordanian national. *See generally Zahren v. Gonzales*, 487 F.3d 1039, 1041 (7th Cir. 2007) (discussing the complexities of determining Jordanian nationality for individuals born in the West Bank and Palestine). It has also been widely reported that Jordan has recently been revoking the nationality of thousands of native Palestinians, often those, like Petitioner's father, who left Jordan. *See* Michael Slackman, *Some Palestinian Jordanians Lose Citizenship,*

N.Y. Times, March 13,2010, *http://www. nytimes.com/2010/03/14/world/middleeast/ 14jordan.html;* Human Rights Watch, *Jordan:Stop Withdrawing Nationality from Palestinian–Origin Citizens,* Feb. 1,2010, *http://www.hrw.org/en/news/2010/ 02/01/jordan-stop-withdrawing-nationality-palestinian-origin-citizens.*
Due to the refusal of Jordanian authorities to provide information on the status of Petitioner's travel document request, it cannot be ascertained with certainty whether or to what extent such considerations regarding the nationality of Petitioner and/or his father might actually have on the application process. There is, however, reason to suspect that the status question has complicated or adversely affected resolution, particularly given the substantial delay and the apparent refusal of Jordanian authorities to provide status information. Indeed, the ICE Deportation Officer handling Petitioner's case hinted as much to him in February 2011, asking Petitioner "where [his] parents were born because it could impact whether travel documents would be issued." (Pet. Decl. ¶ 9(*l*)). Ultimately, the Petitioner is not required to establish "the absence of any prospect of removal-no matter how unlikely or unforeseeable." *Zadvydas*, 533 U.S. at 702, 121 S.Ct. 2491. The Petitioner has met his initial burden under *Zadvydas.*

The responsibility now shifts to the government to rebut the Petitioner's showing. The government argues that Petitioner's removal to Jordan is expected to occur within the reasonably foreseeable future and that he is therefore due to remain in ICE custody. The government makes three supporting arguments. Each is based upon the declaration of Julianty Sutanto, the ICE Deportation Officer responsible for Petitioner's case.

---

**3.** Petitioner has filed a copy of the Jordanian Nationality Law, 1954, without objection. (Doc. 6–4). It is also available online at

*http://www.unhcr.org/refworld/docid/3ae6b4ea 13.html* [accessed 23 June 2011].

First, Sutanto states, "There is no indication that Petitioner will not be issued a Jordanian travel document." (Sutanto Decl. ¶ 49). However, Petitioner's travel document request was submitted to Jordanian authorities over eight months ago, and they have refused multiple requests, both by ICE departments and the Petitioner, to provide any information whatsoever regarding the status or prospects of the request, other than to say it is "pending." The government offers nothing to suggest when an answer might be forthcoming or why there is reason to believe that he will not be denied travel documents. The fact that Jordanian authorities have not said "no" or advised that the Petitioner's request is going to be denied does little in itself to rebut the Petitioner's showing that there is no significant likelihood of his removal in the *reasonably foreseeable future*. *See Hajbeh v. Loiselle*, 490 F.Supp.2d 689, 693 (E.D.Va.2007) (holding that government did not rebut the petitioner's showing where it "presented little more than the repeated claim that negotiations continue and a response is 'expected soon.'"; "[T]he government cannot continue to rely on claims of 'best efforts' and promises that removal is just around the corner when they have no evidence to suggest that progress is being made."); *Mohamed v. Ashcroft*, 2002 WL 32620339, at *1 (W.D.Wash. April 15, 2002) (holding that government did not meet its burden under *Zadvydas* because it provided no evidence regarding how or when it expected to obtain travel documents);

Second, Sutanto suggests that Petitioner's removal is expected to occur in the reasonably foreseeable future because "Petitioner is from Jordan and he was issued a passport in the past by Jordanian authorities." As discussed above, however, Petitioner's birth within the borders of Jordan does not itself confer nationality, there is reason to suspect that Jordanian authorities may question Petitioner's claim to Jordanian nationality through his Palestinian father. Likewise, while it is undisputed that Jordanian authorities previously issued Petitioner a passport, not all Jordanian passports are associated with nationality, *see Zahren*, 487 F.3d at 1041, and it is unclear what type passport was issued to Petitioner. Petitioner's expired passport and his Jordanian birth certificate were included in the travel document request submitted to the Jordanian Embassy, which thus far has done little to expedite processing of the travel document request.

Third and finally, Officer Sutanto highlights that Jordan is a country to which ICE has been able to remove aliens in the past. This statement, however, does little to rebut Petitioner's showing. As a threshold matter, the statement fails to convey, even on average, how often ICE is successful, as opposed to unsuccessful, in removing aliens to Jordan. *See Seretse–Khama v. Ashcroft*, 215 F.Supp.2d 37, 49–50 (D.D.C.2002). While Petitioner does not dispute that ICE has removed some unknown number of aliens to Jordan, a number of reported cases also document such attempts that were apparently unsuccessful.[4] Even more importantly, Sutan-

---

4. *See Othman v. Gonzales*, 2010 WL 1132669 (S.D.Ill. March 1, 2010) (dismissing as moot habeas action challenging legality of detention pending as removal to Jordan where petitioner was released on an order of supervision); *Abukhdair v. Mukasey*, 2008 U.S. Dist. Lexis 113396 (N.D.Fla. Apr. 16, 2008) (same); *Hajbeh*, 490 F.Supp.2d at 691 (recognizing that ICE authorities had abandoned attempts to remove the petitioner to Jordan); *Abdel–Muhti v. Ashcroft*, 314 F.Supp.2d 418, 424–25 (M.D.Pa.2004) ("Jordan has refused [the petitioner] admittance on the basis of his Jordanian birth certificate, finding that his "identity could not be established"); *see also Zahren v. Holder*, 637 F.3d 698, 698 (7th Cir.2011) ("The [government] has filed status reports

to's general assertion tells us little about the prospects for removing someone in the position of this Petitioner, whose Jordanian nationality is subject to question, who left Jordan as a seven-year old child, and has a felony conviction in the United States. *See Kacanic v. Elwood,* 2002 WL 31520362, *4 (E.D.Pa. Nov. 8, 2002).

In summary, the government's response certainly establishes that it has attempted to secure a travel document for the Petitioner from Jordan in good faith and with diligence, but the government can identify no specific evidence to support the position that his removal is likely in the reasonably foreseeable future. The government has failed to rebut the Petitioner's showing that there is no significant likelihood of removal in the reasonably foreseeable future. Accordingly, Petitioner is entitled to habeas relief under *Zadvydas* authorizing his release on an order of supervision.

## III. CONCLUSION AND NOTICE OF RIGHT TO OBJECT

Based on the foregoing, it is recommended that the petition for a writ of habeas corpus seeking Petitioner's release under an order of supervision is due to be GRANTED. Petitioner's motion for an expedited ruling and to set a hearing on his habeas petition (Doc. 7) is due to be deemed MOOT.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed.R.Civ.P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this re-port and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

As to the foregoing it is SO ORDERED this the 24th day of June, 2011.

regarding the attempts and has informed the court that Jordan refuses to accept the petitioner."); *Dar–Salameh v. Gonzales,* 468 F.3d 47, 50 (1st Cir.2006) ("Although the original deportation order had specified Jordan as the country of removal, Jordan refused to recognize Dar–Salameh as a Jordanian citizen and denied him entry."); *Elashi v. Sabol,* 714 F.Supp.2d 502, 505 (M.D.Pa.2010) (ordering release on order of supervision under Zadvydas after "Israel, Jordan, and Egypt ... declined to issue travel documents....").